**B & B OIL & CHEMICAL CO., Plaintiff,**

v.

**FRANKLIN OIL CORP., John Knowles & Raymond DeWitt, Defendants.**

**Civ. A. No. 27089.**

United States District Court
E. D. Michigan, S. D.

Nov. 14, 1968.

**1314**

Gerald Curtis, Detroit, Mich., for plaintiff.

Herbert N. Weingarten, Detroit, Mich., for defendants.

## OPINION and ORDER

TALBOT SMITH, District Judge.

This case involves a controversy between the Franklin Oil Company (Franklin), a compounder or manufacturer (both terms are employed by the parties) of petroleum products, two of its present employees, Knowles and DeWitt, and a one-time exclusive distributor of Franklin products, the plaintiff B & B Oil and Chemical Corporation. In brief, Franklin removed B & B as its distributor (B & B alleges by devious means) and itself took over a lucrative account, that of Chevrolet in Flint. B & B brings this anti-trust action, charging violations of the Sherman and Clayton Acts.

The case comes to us at this time on renewed motions for a) summary judgment, b) to dismiss, and c) or for judgment on the pleadings. Earlier in the year we denied such motions on the ground that the facts and issues were not then sufficiently clear to warrant the grant. With further pre-trials, stipulations, and statements by the parties, the motions are ripe for rehearing and decision. A caveat on the state of the pleadings should be noted. This is an old case. It was started by a complaint charging a violation of " * * * Chapters 1 and 15 of Title 15 of the U.S. Code, commonly known as the Sherman Act and the Clayton Act. * * * " A "First Amended Complaint" was later filed, following which, at a later date, a "Second Amended Complaint", in which the violations charged now read " * * * violation of Title 15, Chapter 1, Sections 1, *2*, and 15 of the U.S.Code * * * " [emphasis ours]. With trial set for November 12th, counsel requested conference on October 21st, defense counsel asserting that in the light of the depositions taken, and their disclosures, read in the light of the Amended Complaint, defendants were not certain as to just what charges were to be pressed at trial. It was clear that counsel's apprehensions were well-grounded and the Court on October 22nd directed both counsel to prepare and submit upon short notice,[1] a stipulation of whatever facts could be agreed upon, a list of the essential elements of each offense charged, a summary of the evidence to be adduced in support thereof, together with a summary statement of the defense to be tendered as to each element of each offense charged. As a result we have received a stipulation of facts, a document entitled "Plaintiff's Claim," together with a later handwritten Memorandum from plaintiff in opposition to the rehearing ordered on the above motions. Defendants have submitted defenses which we have marked Part 1 and Part 2 and brief in support thereof. The foregoing documents have been marked and made a part of the record. Much of the difficulty in bringing this case to proper issue has been plaintiff's adoption of the pleadings in cases the plaintiff regarded as controlling but differing on their facts. We have now pierced the pleadings, so to speak, and it is clear that the facts before us are relatively simple. A statement of the

---

1. This case has been on our docket for three years, with trial date (Nov. 12th) having been set on June 10, 1968.

case dictated by the Court in the presence of counsel, and with their approval, at the last pre-trial, on October 30th, appears in the footnote.[2] It will be elaborated upon in the course of our opinion. We will now rule on the motions made and renewed.

Franklin is an Ohio corporation, engaged in the manufacture and sale of petroleum products. In 1957 Franklin appointed B & B as its sole agent in a defined area.[3] Defendants Knowles and DeWitt were salesmen for B & B, Knowles handling the account of the Flint Chevrolet Division of General Motors (Chevrolet) for the sale and reclaiming of a forging compound. (This is a petroleum compound used in the manufacture of forgings, and, it was admitted on oral argument, widely sold by various companies under various formulae, to Ford, General Motors, Chrysler, and others.) The parties have stipulated that there are many independent companies engaged in the business of analyzing these petroleum compounds and determining the formulae used. These companies can reproduce a compound in from two to four weeks and they can be manufactured in another two weeks. This was known to all of the parties and particularly to the plaintiff.

The method of doing business between Franklin and B & B as relates to Chevrolet was this: Franklin manufactured the compounds. They were shipped by Franklin directly to Chevrolet on B & B's order, and bearing B & B's name. Reclaimed oil from Chevrolet was similarly handled. It was shipped by Chevrolet to B & B in care of Franklin, Bedford, Ohio. After reprocessing it was shipped back by Franklin (again in the name of B & B) to Flint. Franklin would then invoice B & B and B & B invoice Chevrolet. There came a time when Franklin decided to eliminate the middle-man and deal directly with Chevrolet. It did so and this suit eventually followed.

It is only at the point of elimination that factual controversies arise. All of the above is stipulated. B & B says that Franklin "conspired" with Knowles and DeWitt to take over the lucrative Chevrolet account for themselves, that falsehoods and deceit were employed, that Knowles and DeWitt, who were allegedly pirated away from B & B by Franklin, had access to B & B's confidential records and that they took with them "data necessary to the conduct of plaintiff's business". (This refers to GM's specifications for the forging compound, available to any party interested in selling to GM upon request). Further, that Knowles and DeWitt, before "or at the time of leaving plaintiff's employ, secretly solicited plaintiff's customers on behalf of Franklin Oil Corporation and did other acts to prevent plaintiff from

2. "This case involves allegations of offenses against the anti-trust laws. The defendant, Franklin Oil Corporation, compounded certain petroleum products. Plaintiff B & B Oil & Chemical Company was its exclusive distributor in this area. The controversy revolves around the loss by B & B to Franklin of its General Motors-Chevrolet-Flint business.
It is the claim of the plaintiff that this was accomplished by an illegal and unlawful means. It is the claim of the defendant that as a matter of law, although the means employed by the defendants may have been tortious, they did not constitute an offense under the anti-trust laws under which this action is brought.
Certain factual defenses will be offered, but in substance this is the issue of law presented at this time.

Plaintiff's allegation is that the defendant's employees contacted customers who had formerly been involved in the B & B —Franklin relationship.
The incidents relied upon by the plaintiff are the Flint-General Motors-Chevrolet account and an incident involving Decker Nut Manufacturing Company involving $19.00 or a small amount. These are the only customer infractions that are being complained about."

3. The pleadings state that B & B "and another" were so designated, but the words quoted were orally stricken at the latest pre-trial conference, that of October 31st.

acquiring new business from its customers." This allegation, taken verbatim from Albert Pick-Barth Co. v. Mitchell Woodbury Corp., 57 F.2d 96 (C.A. 1, 1932) [4] applies in our case to the two customers referred to in the Court's Pre-Trial Summary of the case, found in footnote 1 hereof. In addition, plaintiff originally alleged (Complaint, ¶ 18) that because of the conspiracy of the defendants "the business of plaintiff has been destroyed." It appears now, however, that what this means is that "plaintiff's business was destroyed as it existed at the time of defendants' acts" since all of these acts were done, charges B & B, "to obtain for defendants the value of plaintiff's business with Chevrolet Division of General Motors Corporation".[5]

■ Defendants counter with such assertions as that Knowles left B & B because a promised stock deal did not work out, that Franklin terminated B & B's dealership because B & B, without the knowledge or consent of Franklin, was purchasing forging compounds elsewhere, and similar alleged exculpatory matters. We find it unnecessary to outline in more detail the defendants' various defenses, since upon this motion we will accept as established all of plaintiff's well-pleaded allegations.

It is obvious at this point that what Franklin did here was to eliminate the dealership of a distributor who enjoyed a lucrative account and take over the account itself. We accept, as we must for the purposes of this motion, and for such purpose only, the allegations that Franklin accomplished this objective by the use of deceitful and unfair representations and conduct.

■ What must be borne in mind from the very outset of our consideration of such charges as this, however, is that the anti-trust statutes upon which plaintiff here relies do not purport to be a code of ethical behavior for the conduct of business. As was held in the Apex Hosiery case,[6] involving an invasion of a factory in a strike situation, accompanied by a destruction of property by force and violence "of the most brutal and wanton character",

"Underlying and implicit in all of them is recognition that the Sherman Act was not enacted to police interstate transportation or to afford a remedy for wrongs which are actionable under state law, and result from combinations and conspiracies which fall short, both in their purpose and effect, of any form of market control of a commodity, such as to 'monopolize the supply, control its price, or discriminate between its would-be purchasers.' "

Likewise, in the Hunt case [7] (involving union refusal to treat with a certain trucker, forcing him out of business) the court stated, with reference to the Sherman Act:

"That Act does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce."

---

4. " * * * that before leaving its employ, said Stuart and McDonald secretly solicited the plaintiff's customers in behalf of the defendant corporation and did other acts to prevent the plaintiff acquiring new business * * * " 57 F.2d 96, 98.

5. We have taken the quotations above from "Plaintiff's Claim" submitted in response to the Court's Pre-Trial Order of October 22nd. The original complaint has been amended, re-amended and verbally amended further. It follows verbatim in many clauses, as plaintiff with commendable frankness admits, the bills of complaint employed in Perryton Wholesale Co., Inc. v. Pioneer Distrib. Co. of Kan-

sas, 353 F.2d 618 (C.A. 10, 1965) and Albert Pick-Barth Co. v. Mitchell Woodbury Corp., 57 F.2d 96 (C.A. 1, 1932) which plaintiff relies upon as controlling here. The direction to plaintiff to cut through the formal and general allegations and get to the heart of the matter resulted in the submission of "Plaintiff's Claim" to which we advert from time to time as noted.

6. Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982 (1940).

7. Hunt v. Crumboch, 325 U.S. 821, 65 S.Ct. 1545, 89 L.Ed. 1954.

The attempt is frequently made, with respect to the cases involving termination of dealerships, to employ the anti-trust acts as a policing measure. Most, if not all, of the cases involving such terminations contain, indeed are based upon, allegations such as we have before us. Usually the acts are such as to conceivably come within the ambit of state laws relating to what we may term generically unfair competition (lack of proper notice of termination, pirating of employees, taking over favored accounts, and similar activities). But the anti-trust acts do not purport to formulate a code of business morality. They are not tablets of stone for the conduct of business generally. They are directed at one aspect of business life and one only: the preservation of free competition. It has been held many times that although Section 1 of the Sherman Act is phrased in the broadest terms, nevertheless it is aimed at the prevention of restraints of competition. Thus it was held in Northern Pacific R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) that (referring to Section 1):

"Although this prohibition is literally all-encompassing, the courts have construed it as precluding only those contracts or combinations which 'unreasonably' restrain *competition*." (Emphasis supplied.)

The same principles apply to Section 2. As was stated in United States v. Standard Oil Company of New Jersey, 221 U.S. 1, 31 S.Ct. 502, 55 L. Ed. 619 (1911). Section 2, in making unlawful both conspiracy to monopolize and monopolization, makes such acts unlawful to bring about the results condemned in Section 2 (unlawfully restraining competition). Thus we are back to restraints on competition. In fact, monopolization may be defined as a restraint of competition.

It is just at this point that plaintiff's case fails, even conceding the iniquities charged, since the result of the defendants' activities is not destruction of competition but merely the substitution of one supply source for another, whether it be the manufacturer himself or another distributor. The opinions have been unanimous, insofar as we have been able to determine, in holding that a manufacturer's changes in his distribution system, vertical realignments, eliminations, or transfers, do not offend the anti-trust acts. One of the leading cases in this field comes from this Circuit, Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6 Cir., 1963) cert. den. 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 in which Judge Shackleford Miller and the Court considered an allegation that Stroh Brewery and other defendants conspired to cancel the distributorship agreement; that the new distributor leased property and bought a fleet of trucks and applied for a liquor permit; that the new distributor hired plaintiff's manager and route salesman, who thereupon induced plaintiff's truck drivers and salesmen to leave plaintiff's employ, all without prior notice to plaintiff. The complaint further alleged that all of these acts were actually done, that the employees left without notice, and that as a result thereof the plaintiff's business was destroyed. Motion to dismiss the complaint was granted by the District Court and affirmed. The Court said:

"Whether a cause of action exists under the antitrust laws is the sole issue in this case. In that connection it is well settled that tortious conduct against one engaged in interstate commerce or which has an affect on interstate commerce does not automatically constitute a violation of the Sherman Act."

The Court went on to say that, although every commercial contract has some restraining effect upon trade, the substitution of one distributor for another in a competitive market is not an unreasonable restraint of trade.

Similar holdings will be found in Robinson v. Stanley Home Products, Inc., 272 F.2d 601 (1 Cir. 1959); Fedderson Motors v. Ward, 180 F.2d 519 (10 Cir. 1950); Shotkin v. General Electric Co.,

171 F.2d 236 (10 Cir. 1948); Nelson Radio & Supply Co. v. Motorola, Inc., 200 F.2d 911 (5 Cir. 1952); cert. den. 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356; Richardson v. Chrysler Motors Corporation, 257 F.Supp. 547 (S.D. Texas 1966) (Refusal to grant a franchise.) See, also, Scanlan v. Anheuser-Busch, Inc., 9 Cir., 388 F.2d 918; Industrial Building Materials, Inc. v. Inter-Chemical Corporation, et al. (C. D.Calif.1967), 278 F.Supp. 938; Peerless Dental Supply Co., Inc. v. Weber Dental Manufacturing Company, (E.D. Penn.1968), 283 F.Supp. 288; First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L. Ed.2d 569 (1968).

Should, of course, the transfer of business (or a concentration of business) look to or accomplish a monopoly, different considerations control. As was said in Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162, *"In the absence of any purpose to create or maintain a monopoly,* the act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to the parties with whom he will deal." [Emphasis supplied.] United States v. Colgate Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992. See Associated Press v. United States, 326 U.S. 1, 15, 65 S.Ct. 1416, 1422, 89 L.Ed. 2013; United States v. Bausch & Lomb Co., 321 U.S. 707, 721–723, 64 S.Ct. 805, 812, 88 L. Ed. 1024.

This brings us to the matter of monopoly. It has gotten into this case through the back door, so to speak. Initially, plaintiff made no complaints about monopoly. However, when the case of Perryton Wholesale v. Pioneer, supra upon which (with *Albert Pick-Barth Co.,* supra) plaintiff relies, was discovered, plaintiff stated in its brief opposing the original motion for summary judgment as follows:

"9. Paragraph 9 of Perryton has no corresponding paragraph in the First Amended Complaint of B & B. Pursuant to Rule 15, plaintiff will move to amend its Complaint to include an allegation of the defendants herein *combining to monopolize* any part of the trade or commerce among the several states contrary to Title 15, Chapter 1, Sections 2 and 15 of the U.S. Code." [Emphasis ours]

The resultant amendment (paragraph 14(8), second amended Bill of Complaint) merely changed the violations charged from "sections 1 and 15 of the U.S. Code" to "sections 1, 2, and 15 of the U.S. Code". The charge is clarified, however, in the statement of "Plaintiff's Claim" required by Pre-Trial Order of October 22nd. It appears herefrom that Franklin allegedly refused to turn over to B & B certain petroleum products returned by Chevrolet to it via Franklin. (This is the return-of-reclaimed oil phase of the business described under our paragraph supra concerned with "The method of doing business" between Franklin and B & B). This refusal, plaintiff charges "was also an attempt by defendants to monopolize this portion of the business of Chevrolet Division of General Motors Corp. by foreclosing plaintiff from that market."

Here plaintiff misconceives the monopoly doctrine. This take-over by Franklin of merely the sale of its own product, without more, is in no sense a monopolistic practice. Franklin obviously wished to have the Chevrolet forging compound business, "monopolize" it if you will. But that, by itself, is not the kind of monopoly with which the Sherman Act deals. A manufacturer's attempt to gain the custom of a large user, and thus promote the sale of its own product to its own economic advantage, is not an offense. The discussion on monopoly in Industrial Building Materials, Inc. v. Interchemical Corp., 278 F.Supp. 938, 957 (D.C., 1967) is particularly enlightening here. We have stated practically all there is before us on the charge of monopoly and this is not monopoly. There is no allegation anywhere in any pleading, brief,

or statement before us setting forth any facts showing that defendants, in an anti-trust sense, monopolized or attempted to monopolize or conspired to monopolize any part of interstate commerce. There are no factual references to the state of the market, to its distribution in the hands of various suppliers, the relationship of such percentages to plaintiff's and defendants' shares of the market, if any, or any other indicia of monopoly. The conclusory allegation made is not enough, particularly in the light of plaintiff's own explanation thereof.

In this litigation plaintiff has relied on and has quoted from cases which are fundamentally and essentially different cases, involving, as they do, situations in which a third-party defendant, a competitor, has in some way interfered with the operations of the plaintiff. Thus, in Perryton Wholesale, Inc. v. Pioneer Distributing Co. of Kan., 353 F. 2d 618 (C.A. 10, 1965), Perryton and Pioneer were competitors on a horizontal level, Perryton seducing away Pioneer's employees "to eliminate the competitor predominant in the area". In Albert Pick-Barth Co. v. Mitchell Woodbury, Inc., 57 F.2d 96 (C.A. 1, 1932) we had the same situation, namely, plaintiff and defendant were competitors in the kitchen equipment business. In neither case, in neither situation, was there involved a vertical realignment, the elimination of a former exclusive distributor. We find no warrant in the statutes for extending the anti-trust prohibition to cover this situation. Such a holding would open up a new chapter in anti-trust law, and without statutory warrant, subjecting the entire field of a manufacturer's internal plan of distribution to the approval of the courts. Moreover, it proves too much. Once we remove the flexibility from manufacturers in their vertical distributorships we freeze to some degree the presently existing structures, with a resultant definite, not fanciful, restraint on the freedom of competition.

This case may be very shortly summarized. Once the borrowed phrases from legitimate anti-trust actions are pierced, it boils down, by plaintiff's own statements, to simply the elimination by the manufacturer of an unwanted distributor. There is thus no unreasonable restraint of "competition" in the anti-trust sense nor is there even a hint of monopoly. The motion for summary judgment is granted.

It is so ordered.