170

Perry J. DREIBUS and Frank G. Coleman, on behalf of themselves and all other shareholders of Velvet Imports, Inc., a corporation, Plaintiffs and Appellants,

v.

Carlyle F. WILSON et al., Defendants and Appellees.

No. 74-1576.

United States Court of Appeals, Ninth Circuit.

Dec. 29, 1975.

Ronald M. Bayer (argued), Los Angeles, Cal., for plaintiffs and appellants.

Joseph D. Mullender, Jr. (argued), of Ball, Hunt, Hart, Brown & Baerwitz, Beverly Hills, Cal., for defendants and appellees.

## OPINION

Before ELY, Circuit Judge, CARTER, Senior Circuit Judge, and EAST, Senior District Judge.*

EAST, Senior District Judge:

The plaintiffs-appellants Dreibus and Coleman (Dreibus Group), as owners of 50 percent of the capital stock of Velvet Imports, Inc., appeal from an order of the District Court dismissing their Clayton Act (15 U.S.C. § 15, *et seq.*) shareholders derivative action for damages and injunctive relief from alleged violations of § 1 (conspiracy, restraint of trade) and § 2 (monopoly) of the Sherman Act (15 U.S.C. §§ 1 and 2) by the defendants-appellees. We affirm.

## FACTS AND RELATIONSHIPS OF THE PARTIES

The plaintiff Dreibus and one Cerf were the sole owners of the capital stock and were officers of American Wood Products, Inc. (American), a furniture manufacturing firm. Neither American nor any representative stockholder thereof is a party to this cause.

American needed velvet (fabric) for its use in manufacturing furniture. Velvet fabric allegedly is in short domestic supply and costly when imported.

Dreibus and Cerf conceived a profitable enterprise in securing a foreign source for American's needs in an importing business for resale to other buyers. They interested and brought in the defendants-appellees Wilson, Smith, and Gatti (Wilson Group) into the enterprise. It was agreed that upon the successful negotiation of a contract with an Italian fabric mill, a new corporation would be formed to administer the contract.

Dreibus and Cerf, with the aid of Gatti, were successful in obtaining a contract between an Italian firm, the defendant Rossitex, S.p.A., and American (Rossitex Contract) for the exclusive distributorship, within an unrestricted area, of a supply of "Prince" (a trade name for a man-made fiber velvet fabric) quality velvet. The contract provided for minimum quantities to be purchased by American yearly. Pursuant to a prior understanding, the parties formed a new corporation, Velvet Imports, Inc. (Imports), with ownership of 50 percent of the capital stock to the Dreibus Group and 50 percent to the Wilson Group. The Rossitex Contract was assigned by American to Imports and each of the parties pledged to the other their faithfulness, time, efforts, and expertise to the success of Imports.

Through some means not revealed in the record, the Dreibus Group lost out and the Wilson Group took over control and management of Imports' business.

## CLAIMS OF THE DREIBUS GROUP

The Dreibus Group allege that the Wilson Group, with a coconspirator, Craftex Corporation (Craftex), "contracted, agreed, combined and conspired to restrain the interstate and foreign commerce and trade in the importation and sale of velvet in the United States" in that they:

(a) Fraudulently induced the assignment of the Rossitex Contract to Imports;

(b) Caused the removal and exclusion of the Dreibus Group from participating in efficient management and sales activities of Imports and with the specific purpose of permitting the Rossitex Contract to lapse into default and inducing the Rossitex firm to cancel the Rossitex Contract for failure to order minimum quantities;

(c) Negotiated a new exclusive distributorship with Rossitex for the importation of the Rossitex firm's velvet, for the benefit of the Wilson Group and Craftex and to the

---

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

exclusion of the Dreibus Group; and

(d) Threatened future similar acts in restraint of competition by hindering and preventing Imports from purchasing velvet in Italy for exportation to the United States.

## MOTIONS OF THE WILSON GROUP

Several of the Wilson Group moved for a dismissal of the action contending that the complaint failed to state a claim upon which relief could be granted, or in the alternative, to make the complaint more definite and certain.

## ACTION BY THE DISTRICT COURT

The District Court determined that the complaint failed to state either a § 1 or a § 2 Sherman Act claim upon which relief could be granted and dismissed the complaint with leave for amendment. The Dreibus Group declined to amend the complaint and the District Court, *sua sponte*, dismissed the action as to all defendants.

## DISCUSSION

*Section 1 Claims:*

At the outset, it must be brought into clear focus that the Rossitex source of imported velvet was not the sole source of Italian man-made fiber velvet actually imported into the United States. The Dreibus Group alleged that the Rossitex Contract was negotiated "*with one of* the Italian fabric mills previously contacted." *See United States Department of Commerce, Bureau of Census*, Vol. FT 246–U.S. (imports for consumption), dollar value of imports of Italian velvets.

■ The Dreibus Group accepts without qualms their exclusive distributorship throughout an unlimited area of the imported Rossitex velvet as valid and urge only that the alleged misconduct and intention of the Wilson Group drove Imports out of its exclusive dis-

tributorship of the Rossitex velvet and replaced it with another exclusive distributorship. The District Court concluded that the substitution of one distributor for another undoubtedly injures the distributor replaced, but it does not injure competition among distributors, and does not violate § 1. *Ace Beer Distributors, Inc. v. Kohn, Inc.,* 318 F.2d 283 (6th Cir.), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963); *accord Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71 (9th Cir. 1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). We agree and subscribe to the following language:

> "Moreover, without more, it is not a *per se* violation for the manufacturer or supplier to combine or conspire with others to make a change in its exclusive franchises, cutting off the supply of a former distributor. *Hawaiian Oke, supra,* at 76. Thus, in this case, the fact that [the Wilson Group], with or without the encouragement of [Rossitex and Craftex], determined to change its exclusive distributorship from [American] to [the Wilson Group-Craftex] and the further contention that [the Wilson Group] and others combined to make that decision have, standing alone, no antitrust significance." *Alpha Distrib. Co. of Cal. v. Jack Daniel Distillery,* 454 F.2d 442, at 452 (9th Cir. 1972), (*Alpha*).

So it necessarily follows that if the exclusive distributorship of Rossitex velvet in American was lawful and valid as claimed by the Wilson Group, so is the new Wilson Group-Craftex exclusive distributorship.

We think the District Court correctly viewed the allegations of antitrust acts and intent as pure allegations of corporate executive unfaithfulness and intracorporate mismanagement on the part of the Wilson Group in dealing Imports out of its distributorship.[1]

---

1. The District Court's opinion states:

"[S]ubversion of a terminated distributor's employees does not make the termination a

violation of the Sherman Act. Even if a disloyal employee conspired with the replacement distributor or the supplier, the

In *Alpha*, the relevant area involved was restricted to the relevantly confined area of northern California, and the product involved was all of the national brands of whiskey, which is to say a massive amount of trade in the commerce of a small area. To us, the importance of the decision in *Alpha* is the premise that:

> "The critical inquiry in such 'refusal to deal' cases is not whether there was a refusal to deal, or whether a refusal to deal was carried out by agreement with others, but rather whether the refusal to deal, manifested by a combination or conspiracy, *is so anticompetitive, in purpose or effect, or both, as to be an unreasonable restraint of trade. Hawaiian Oke, supra,* at 77–78; *Walker Distributing Co. v. Lucky Lager Brewing Co.,* 323 F.2d 1, 7 (9th Cir. 1963). This inquiry is primarily a factual one, and its resolution often requires determination of motive or intent." At 452. (Emphasis supplied).

We cannot read into the Dreibus Group's vague allegations of a refusal to deal a "combination or conspiracy" among the Wilson Group "so anti-competitive, in purpose or effect, or both, as to be an unreasonable restraint of trade" among the competitors in the importation of Italian man-made fiber velvet, or even the Rossitex brand of such product, within the United States as to bring this case within the ambit of the "refusal to deal" holding in *Alpha* at 452. In fact, we think that the effect or impact of the Wilson Group's alleged activity upon the trade of imported Italian velvets and interstate commerce throughout the United States has an insubstantial economic, if not *de minimis* effect upon interstate commerce and regulation under the Commerce Clause is not justified. *See Ford Wholesale Company, Inc. v. Fibreboard Paper Products Corp.,* 493 F.2d 1204, at 1205 (9th Cir. 1974), on the jurisdictional issue.

We believe from the plain reading of the allegations in the complaint that the Rossitex firm found itself dealing with a poor customer in the internally destroyed Imports and had good reason to terminate its contract with Imports and seek a new distributor in Craftex:

> "[A] manufacturer may discontinue a relationship, or refuse to open a new relationship for business reasons which are sufficient to the manufacturer, and adverse effect on the business of the distributor is immaterial in the absence of any arrangement restraining trade or competition."

> "Where, as here, a supplier seeks no more than a . . . more aggressive distributor for his product, his conduct may in fact be more beneficial than detrimental to competition, and is not condemned by either the Sherman

termination does not have Sherman Act dimensions. *Scanlan v. Anheuser-Busch, Inc.,* 388 F.2d 918 (9th Cir.), *cert. denied,* 391 U.S. 916, 88 S.Ct. 1810, 20 L.Ed.2d 654 (1968). As the court said in *B & B Oil & Chemical Co. v. Franklin Oil Co.,* 1969, 293 F.Supp. 1313 (E.D.Mich.1968):

"The attempt is frequently made, with respect to the cases involving termination of dealerships, to employ the antitrust acts as a policing measure. Most if not all of the cases involving such terminations contain, indeed are based upon, allegations such as we have before us. Usually the acts are such as to conceivably come within the ambit of state laws relating to what we may term generally unfair competition (lack of proper notice of termination, *pirating of employees,* taking over favored accounts, and similar activities). But the antitrust acts do not purport to formulate a code of business morality. They are not tablets of stone for the conduct of business generally. They are directed at one aspect of business life and one only: the preservation of free competition.

"1969 Trade Cases ¶ 27,737 at page 86,623 (emphasis supplied). Employee disloyalty may offend state-law principles of competition, but it does not violate national antitrust policy.

"By a simple, unilateral refusal to deal with potential buyers, a firm does not violate the Sherman Act. *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). No special circumstances, such as connection with a price-fixing scheme or elimination of competition with an existing firm, appear to transform this refusal to deal into a Sherman Act case."

or Clayton Acts." *Ricchetti v. Meister Brau, Inc.,* 431 F.2d 1211, at 1214–15 (9th Cir. 1970), *cert. denied,* 401 U.S. 939, 91 S.Ct. 934, 28 L.Ed.2d 219 (1971). *See also Bushie v. Stenocord Corp.,* 460 F.2d 116, 119 (9th Cir. 1972).

We believe that this court's recent decision in *Helix Milling Co. v. Terminal Flour Mills Co.,* 523 F.2d 1317 (9th Cir. 1975), is not applicable to the facts alleged in the Dreibus Group's complaint. *Helix* had lost its producing flour mill by fire. The prior competitive defendants, charged with a § 1 violation and claim, had allegedly interrupted and undercut *Helix's* pending negotiations to purchase and contracted to purchase in its own right an existing producing flour mill, which was the only "economical, feasible method" or means of *Helix's* re-entry into the competitive field of flour milling. The court, under those narrow facts, held that in such a closed market situation, it was error to grant the defendants a summary judgment and thereby "prevent the plaintiff from attempting to prove [its] claim" of "a contract or combination to restrain trade."

In this case, the only "closed market" created by the supplanting Rossitex-Wilson Group and Craftex exclusive distributorship is the importation of the velvet product of the Rossitex mill. It appears on the face of the complaint that the Rossitex mill is only one of the several Italian mills producing the "relevant product" of man-made fiber velvet for import into the United States.

*Section 2 Claim:*

█ The District Court ably reasoned at pages 5–7 of its Opinion:

"The elements of monopolization are a relevant product market, a relevant geographical area, and acts constituting monopolization (or attempts to monopolize or a conspiracy to monopolize). Although the complaint does not define the relevant market and area precisely, it does indicate that Italian velvet is the product and that the United States is the geographical area."

"Only two acts could conceivably be described as acts of monopolization: establishment of an exclusive dealership and replacement of one dealer by another.

"It is possible for the establishment of an exclusive distributorship to constitute monopolization. But even if the establishment of this dealership could constitute monopolization, these plaintiffs cannot recover for it. By their own allegations plaintiffs are the originating, active persons responsible for its establishment. Although the Supreme Court abolished *in pari delicto* as a defense in antitrust cases, the court indicated that a high degree of involvement in the illegal act could constitute a defense. *See Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). The complaint reveals a degree of involvement so great that it would constitute a defense to an antitrust claim based on the establishment of an exclusive distributorship. Since the complaint discloses a defense, it fails to state a claim on which relief can be granted.

"The replacement of Velvet as a distributor could not worsen the competitive structure of the alleged market. A monopoly existed before the change; at worst, a monopoly existed afterwards."

We agree. *See also Columbia Nitrogen Corp. v. Royster Co.,* 451 F.2d 3, 15–16 (4th Cir. 1971); and *Premier Electrical Construction Co. v. Miller-Davis Co.,* 422 F.2d 1132, at 1138 (7th Cir. 1970).

Furthermore, assuming the new Wilson Group distributorship of Rossitex velvet is *per se* lawful and valid, the complaint still fails to allege any realistic, or even possible, resource ability or power on the part of the Wilson Group to monopolize the trade of imported relevant products of Italian velvet throughout the United States. *American Tobacco Co. v. United States,* 328 U.S. 781, 814, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); and *Hallmark Industry v. Reynolds Metals Co.,* 489 F.2d 8, 11–13 (9th Cir. 1974).

We believe the Dreibus Group was properly relegated to the state court for vindication of their state claims against the Wilson Group for corporate executive unfaithfulness and misconduct to the damage of their corporation.

We conclude that the Dreibus Group's complaint fails to state either a § 1 or a § 2 Sherman Act claim upon which relief can be granted. Since the Dreibus Group declined to amend the complaint, the order of the District Court dismissing the action in totality is affirmed.

Affirmed.