854 F.2d 802
 57 USLW 2130, 1988-2 Trade Cases 68,166
 CRANE & SHOVEL SALES CORPORATION, Plaintiff-Appellant,
v.
BUCYRUS-ERIE CO., Bucyrus Construction Products, Northwest
Engineering Co., Jerry A. Moss, Charles Sanford,
GPS Equipment, Defendants-Appellees.
 No. 87-3030.
 United States Court of Appeals,
Sixth Circuit.
 Dec. 17, 1987.
Decided Aug. 4, 1988.
 
 Egidijus Marcinkevicius, Algis Sirvaitis & Assoc., S. Melvin Kociubes (argued), Cleveland, Ohio, for plaintiff-appellant.
 Edward C. Schmidt (argued), Roy A. Powell, Rose, Schmidt, Chapman, Duff & Hasley, Pittsburgh, Pa., Paul Michael Pohl, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for Bucyrus-Erie Co.
 Eric M. Oakley, Frances Floriano Goins (argued), Squire, Sanders & Dempsey, Cleveland, Ohio, for Northwest Engineering, Moss, Sanford & GPS.
 Before JONES, WELLFORD and BOGGS, Circuit Judges.
 BOGGS, Circuit Judge.
 
 
 1
 Plaintiff-appellant Crane & Shovel Sales Corporation (Crane) appeals the district court judgment granting dismissal pursuant to Fed.R.Civ.P. 12(b)(6) of its complaint alleging that defendants-appellants Bucyrus-Erie Co. (B-E), Bucyrus Construction Products (BCP), Northwest Engineering Co., Jerry A. Moss (Moss), Charles Sanford (Sanford), and GPS Equipment Corporation (GPS) restrained trade in violation of Section 1 of the Sherman Anti-Trust Act, and Chapter 1331 of the Ohio Revised Code (analogous state antitrust law.)[1] This case presents intriguing questions concerning the legal sufficiency of an antitrust complaint. For the reasons set forth below, we affirm.
 
 
 2
 * On May 16, 1986, Crane filed a complaint in district court essentially alleging that the defendants violated the Sherman Anti-Trust Act, and analogous state antitrust law, by conspiring to effect its termination as the distributor of BCP construction machinery parts, and the termination of all other similarly situated distributors for the Ohio and West Virginia area, and in causing an exclusive territorial distributorship for those parts to be given to GPS, a corporation formed shortly after Crane was terminated as a BCP distributor. While the defendants dispute certain facts in the complaint, we, for the purpose of reviewing a granted 12(b)(6) motion to dismiss, assume those facts to be true.
 
 
 3
 As the complaint states, in March 1984 plaintiff Crane, an Ohio corporation engaged in the business of selling parts for and making repairs to cranes and other construction equipment, was the distributor of construction machinery parts produced by defendant B-E. B-E was a manufacturer of construction equipment and other industrial products with its principal place of business in South Milwaukee, Wisconsin. On March 15, 1985, BCP, a manufacturer of construction equipment and other products with its principal place of business in Green Bay, Wisconsin, bought the construction machinery division of B-E, and permitted Crane to continue distributing the construction machinery parts made by its newly acquired division. Defendant BCP is a division of defendant-appellee Northwest Engineering Company, which is not alleged to have been an active participant in any conspiracy to restrain trade.
 
 
 4
 Sometime before February 20, 1986, defendant Moss ceased employment with B-E, and began employment with BCP as its Chief Operating Officer. On February 20, 1986, Moss, on behalf of BCP, orally advised Crane that after April 15, 1986 it could no longer distribute BCP construction machinery parts. This oral advice was confirmed by letter dated February 26, 1986. Crane alleged that it had distributed BCP parts without written contract, and without problem, for about one year before BCP indicated that Crane could no longer sell those parts for it. Crane further alleged that it had invested considerable time and money in the distribution of these parts in reliance on oral assurances from BCP that it would continue to use Crane as its distributor. Moss, an employee of B-E in its construction machinery division before B-E sold that division to BCP, Crane alleged, followed the product line to its new owner. Only thereafter, Crane stated in the complaint, was it terminated as a distributor of BCP construction machinery parts.
 
 
 5
 In March 1986, GPS was formed. Moss was both a substantial shareholder and an officer of GPS. Defendant Sanford was also a substantial shareholder and officer of GPS, and, from the complaint, it appears had no interest in or employment with B-E, BCP, or Northwest Engineering. In March 1986, GPS was made the exclusive distributor of BCP construction machinery parts for the states of Ohio and West Virginia. Crane specifically alleged that BCP and the other defendants conspired to terminate Crane's distributorship rights "so that a new distributorship, with whom defendant Moss has an economic interest, could take over plaintiff (Crane's) business." After April 15, 1986, Crane's distributorship rights were permanently terminated. According to Crane's complaint, all of these actions were "entered into with the purpose and effect of eliminating plaintiff as a competitor and to destroy the business of plaintiff."
 
 II
 
 6
 On June 10, 1986, B-E filed a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief could be granted on the federal and state antitrust claims. On August 5, 1986, Northwest Engineering Company, Moss, Sanford, and GPS filed similar motions. Each defendant argued, inter alia, that Crane had failed to state a cause of action under the Sherman Anti-Trust Act and analogous state law regarding their actions as alleged in the complaint.
 
 
 7
 On December 8, 1986, the district court granted all of the motions to dismiss. In the district court's view, Crane had simply failed to allege sufficient facts to establish a conspiracy to restrain trade under the Sherman Anti-Trust Act. Regarding B-E, it stated that "[t]here is no inference that this court can find to include B-E in an alleged conspiracy." The district court concluded that "the sole fact that defendant Moss had been a B-E employee in the construction machinery division before B-E sold it to BCP does not indicate any present interest B-E has in the distribution of BCP product," nor does it indicate any violation of the Sherman Anti-Trust Act on Moss's part.
 
 
 8
 The district court held that Crane's allegations that BCP conspired with Moss and Sanford to exclude Crane from distributing construction machinery parts were too general to state a conspiracy in restraint of trade under the Sherman Anti-Trust Act. In the district court's view, "[t]he substitution of one distributor for a product with another distributor does not in itself restrain trade within the meaning of the [Sherman Anti-Trust] statute." It stated that "[a] refusal to deal does not become illegal under the Sherman Act unless 'it produces an unreasonable restraint of trade, such as price fixing, elimination of competition or the creation of a monopoly,' " quoting from Ace Beer Distributors, Inc. v. Kohn, 318 F.2d 283, 287 (6th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963). The fact that Moss, a former employee of B-E and at the time Chief Operating Officer of BCP, was interested in GPS which was awarded an exclusive distributorship of BCP construction machinery parts, did not, in the district court's view, distinguish Crane's case from a classic "jilted distributor" case for which no recovery under Section 1 of the Sherman Act is available. As to GPS, the district court found it was not in existence at the time the decision was made by Moss to terminate Crane as a distributor of BCP construction machinery parts, and so could not have been part of a conspiracy to restrain trade. We are in essential agreement with the district court's analysis and conclusions, and accordingly assess that complaint in terms of its allegations of restraint of trade.
 
 III
 
 9
 Section 1 of the Sherman Anti-Trust Act states that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign states, is declared to be illegal." 15 U.S.C. Sec. 1. In Davis-Watkins Co. v. Service Merchandise, 686 F.2d 1190, 1195-96 (6th Cir.1982), we held that "to establish a claim under section 1, the plaintiff must establish that the defendants contracted, combined or conspired among each other, that the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets, that the objects of and conduct pursuant to that contract or conspiracy were illegal and that the plaintiff was injured as a proximate result of that conspiracy." (citation omitted).
 
 
 10
 The essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms to prevent dismissal of the complaint on a defendant's 12(b)(6) motion. Hohensee v. Akron Beacon Journal Publishing Co., 174 F.Supp. 450, 452 (N.D.Ohio 1959), aff'd, 277 F.2d 359 (6th Cir.), cert. denied, 364 U.S. 914, 81 S.Ct. 277, 5 L.Ed.2d 227 (1960). Since either conspiracy or restraint of trade is an essential element of a Section 1 Sherman Anti-Trust claim, failure to allege either one justifies dismissal of an antitrust claim. Havoco of America, Ltd. v. Shell Oil Company, 626 F.2d 549, 557 (7th Cir.1980) (insufficient allegations of anticompetitive effect); Stewart v. Hevelone, 283 F.Supp. 842, 845 (D.C.Neb.1968) (insufficient allegations of conspiracy).
 
 
 11
 Courts have discerned two major types of antitrust conspiracies to restrain trade: horizontal and vertical. Horizontal conspiracies involve agreements among competitors at the same level of competition to restrain trade, such as agreements among manufacturers to fix prices for a given product and geographic market, or among distributors to fix prices for a given market. Vertical conspiracies, on the other hand, involve agreements between competitors at different levels of competition to restrain trade, such as agreements between a manufacturer and its distributors to exclude another distributor from a given product and geographic market.
 
 
 12
 In Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), the Supreme Court held that vertical distribution restraints are to be tested under the rule of reason, and would no longer be barred under a per se rule. In Com-Tel, Inc. v. Dukane Corp., 669 F.2d 404, 408 (6th Cir.1982), we recognized that the Supreme Court in Sylvania "reinstated the rule of reason for vertical distribution restraints."
 
 
 13
 In Oreck Corporation v. Whirlpool Corporation, 579 F.2d 126, 131 (2d Cir.), cert. denied, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978), the Second Circuit, in essential agreement with our analysis, stated the following:
 
 
 14
 It is important to distinguish between "horizontal" restraints, i.e. agreements between competitors at the same level of market structure, and "vertical" restraints, i.e. combinations of persons at different levels of the market structure, such as manufacturers and distributors. Horizontal restraints alone have been characterized as 'naked restraints of trade with no purpose except stifling competition,' ... and, therefore, per se violations of the Sherman Act. On the other hand, while vertical restrictions may reduce intrabrand competition by limiting the number of sellers of a particular product, competing for a given group of buyers, they also promote interbrand competition by allowing a manufacturer to achieve certain efficiencies in the distribution of its products.... They are, therefore, to be examined under the rule of reason standard. (citations omitted)
 
 
 15
 Since different antitrust principles apply depending on whether a given restraint of trade is either horizontal or vertical, classification is thus critically important. A manufacturer's substitution of one distributor for another has been classified by this Circuit as a vertical restraint of trade case, and, pursuant to Supreme Court command, has tested such a case under the rule of reason.
 
 
 16
 We have consistently held that a complaint which simply alleges that a manufacturer substituted one distributor for another fails to state a violation of the rule of reason, unless it also alleges anticompetitive effect at the interbrand level. In Sylvania, 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19, the Supreme Court explained the distinction between interbrand competition and intrabrand competition:
 
 
 17
 Interbrand competition is the competition among the manufacturers of the same generic product--television sets in this case--and is the primary concern of antitrust law. The extreme example of a deficiency of interbrand competition is monopoly, where there is only one manufacturer. In contrast, intrabrand competition is the competition between the distributors--wholesale or retail--of the product of a particular manufacturer.
 
 
 18
 In Dunn & Mavis, Inc. v. Nu-Car Driveway, 691 F.2d 241, 243-44 (6th Cir.1982), we held that a complaint which does no more than state commercial disappointment at losing a distribution contract with a manufacturer fails to allege restraint of trade. Specifically, we stated that "[s]ince the complaint does not allege facts suggesting that Chrysler's refusal to deal had any significant anti-competitive effect on the market, there is no rule of reason case alleged." 691 F.2d at 245.
 
 
 19
 Similarly, in Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963), we held that a complaint which essentially alleged that a brewery substituted one territorially exclusive distributor for another territorially exclusive distributor was insufficient to state a violation of Section 1 of the Sherman Anti-Trust Act. In explaining the insufficiency of the complaint, we stated that "[t]here is no allegation or contention that the beer of other breweries was not just as available in that area after the change in distributors as it was before." 318 F.2d at 287 (emphasis supplied).
 
 
 20
 In Fray Chevrolet Sales, Inc. v. General Motors Corp., we upheld the district court's dismissal of an antitrust claim on a summary judgment motion "because the substitution of one distributor ... for another ... does not eliminate or materially diminish the existing competition ... and, in our opinion, is not an unreasonable restraint of trade." 536 F.2d 683, 686 (quoting Ace Beer, 318 F.2d at 287). The Fray court's reliance on Ace Beer suggests that the substitution of one distributor for another has no necessary effect on competition at the interbrand level. In Fray, we also quoted from B & B Oil & Chemical Co. v. Franklin Oil Corp., 293 F.Supp. 1313, 1317 (E.D.Mich.1968) in which the district court said that the " 'opinions have been unanimous ... in holding that a manufacturer's changes in his distribution system, vertical realignments, or transfers, do not offend anti-trust laws.' " Ibid.
 
 
 21
 Other Circuits have adopted similar principles. In Oreck, the Second Circuit held that an agreement between a manufacturer and a distributor "becomes violative of Sec. 1 of the Sherman Act only if it is anticompetitive in purpose or effect --in sum, it must be tested by the rule of reason." 579 F.2d at 133. The Fifth Circuit held that even if a conspiracy between a supplier and its distributor to eliminate another distributor were proven, the supplier would not have violated the antitrust laws. H & B Equipment Co. v. International Harvester Co., 577 F.2d 239 (5th Cir.1978). The Fifth Circuit has stated that "a supplier's termination of a distributor or dealer is not a violation of the antitrust laws as long as interbrand competition acts as a 'significant check on the exploitation of intrabrand market power.' " Muenster Butane, Inc. v. Stewart Co., 651 F.2d 292, 297 (5th Cir.1981) (quoting Continental T.V., 433 U.S. 36, 52 n. 19, 97 S.Ct. 2549, 2558 n. 19, 53 L.Ed.2d 568 (1977) (other citations omitted). The Tenth Circuit held that "[t]he evil to be avoided is ... not the reduction of intrabrand competition." Westman Commission Co. v. Hobart International, 796 F.2d 1216, 1229 (10th Cir.1986).
 
 
 22
 Thus, Sixth Circuit precedent, supported by antitrust law in other Circuits, makes clear that a complaint charging restraint of trade based on a manufacturer's substitution of one distributor for another must allege anticompetitive effect at the interbrand level to survive a Rule 12(b)(6) motion for failure to state a violation of Section 1 of the Sherman Anti-Trust Act.
 
 IV
 
 23
 Under Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 525, 103 S.Ct. 897, 901, 74 L.Ed.2d 723 (1983), we must assume the truth of the allegations in a complaint when assessing its legal sufficiency. We are also bound by the principle set forth in Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), that "[i]n appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."
 
 
 24
 At the outset, we state our agreement with the district court that B-E's involvement in any conspiracy to restrain trade is far too remote as alleged in the complaint to warrant serious treatment. The mere fact that Moss had once been a B-E employee does not, as the district court held, mean that B-E played any role in the alleged restraint of trade.
 
 
 25
 Crane initially maintains on appeal that its complaint stated that BCP and other defendants eliminated all distributors of BCP construction machinery parts, and therefore sufficiently alleged an illegal restraint of trade under Section 1 of the Sherman Anti-Trust Act. However, as we read it, the complaint implies that Crane was the only distributor of BCP construction machinery parts, before being replaced by GPS. (See Complaint, 5-6, para. 19 ("new exclusive distributor for the states of Ohio and West Virginia.")) Indeed, the name of no other distributor appears anywhere in the complaint. The Fifth Circuit has stated that "[t]he law is clear that merely changing from one exclusive distributor to another is permitted." Aladdin Oil Co. v. Texaco, Inc., 603 F.2d 1107, 1117 (5th Cir.1979).
 
 
 26
 Crane contends, however, that it had met this Circuit's standard for stating a Section 1 Sherman Anti-Trust Act violation because its complaint alleged the elimination of "all intrabrand competition in [a] two state area." Crane attempts to distinguish the "jilted distributor" precedent of this Circuit by suggesting that its situation involves the elimination of an entire set of distributors, whereas precedent involves the substitution of one distributor for another. Crane essentially suggests that its case involves the elimination of all intrabrand competition, whereas in the other cases the level of intrabrand competition remained the same as before the dealer substitution, since one distributor is simply being substituted for another. However, even if we assume the complaint to state the elimination of a plurality of distributors, and therefore the elimination of intrabrand competition, we hold that the complaint nevertheless fails to allege restraint of trade under Section 1 of the Sherman Anti-Trust Act.
 
 
 27
 By suggesting that alleging the elimination of all intrabrand competition is tantamount to stating anticompetitive effect, Crane implicitly suggests that this Circuit adopt a per se test of illegality under Section 1 of the Sherman Anti-Trust Act for the situation in which a manufacturer "jilts" all of its distributors, and subsequently awards an exclusive distributorship for a given product and geographic market to another distributor.
 
 
 28
 Crane fails to recognize, however, that the Supreme Court has admonished that
 
 
 29
 [p]er se rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive.... "[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."
 
 
 30
 Continental T.V., Inc., 433 U.S. at 49-50, 97 S.Ct. at 2557 (quoting Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (footnote omitted)).
 
 
 31
 We believe that even the manufacturer's elimination of all distributors with the subsequent awarding of an exclusive distributorship to another distributor falls below the "manifestly anticompetitive" standard enunciated by the Supreme Court, and so accordingly decline Crane's implicit invitation to adopt a per se test of illegality regarding this kind of vertical restraint of trade. We find the "jilted distributor" cases sufficiently broad to accommodate the situation of a manufacturer's elimination of all intrabrand competition on the facts of the case at bar.
 
 
 32
 Were a per se test of illegality necessarily applied to elimination of all intrabrand competition by a manufacturer, we fear that procompetitive vertical restraints may be seriously deterred. E.g., see Bork, Vertical Restraints: Schwinn Overruled, 1977 Sup.Ct.Rev. 171, 181-82; see also Posner, The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality, 48 U.Chi.L.Rev. 6, 23-26 (1981) (vertical restrictions on intrabrand competition generally should be legal per se ). As a result of the exclusive distributorship arrangement with GPS, BCP may be able to increase its ability to compete with other brands of construction machinery parts. Nothing to the contrary is stated, or implied in the complaint.
 
 
 33
 In Davis-Watkins, 686 F.2d at 1196, we stated that "restraints imposed by a manufacturer or supplier upon its distributors or retailers, so-called 'vertical' restraints, are generally found to be potentially beneficial to interbrand competition." To be sure, the consequence of the establishment of an exclusive distributorship is that a consumer in Ohio and West Virginia must deal with defendant GPS Equipment or not deal at all. However, we do not agree that an exclusive territorial distributorship of the kind alleged in the complaint is necessarily inimical to consumers, or violative of the antitrust laws. See Easterbrook, Vertical Arrangements and the Rule of Reason, 53 Antitrust L.J. 135, 140-53 (1984) (restricting dealerships may increase competitive ability). See also Business Electronics Corp. v. Sharp Electronics Corp., --- U.S. ----, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988) ("the scope of per se illegality should be narrow in the context of vertical restraints.")
 
 
 34
 Second, Crane vigorously argued on appeal that since "Moss holds an independent personal stake in destroying plaintiff's distributorship as it would profit GPS and him personally and eliminate competition," the decision to terminate Crane had a horizontal element, and thus differed from the classic jilted distributor case which is tested under the rule of reason. In its main brief and supplemental brief, Crane argued that its case was not a jilted distributor case since it involved "a one-half owner and officer of an exclusive territorial distributorship, who is also a high level management official of the manufacturer and franchiser."
 
 
 35
 In Tunis Brothers Company, Inc. v. Ford Motor Company (Tunis I), 763 F.2d 1482, 1498 (3rd Cir.1985)[2] the Third Circuit stated that the duality of position or interest of a manufacturer's employee(s) with its distributor or distributors benefiting from the manufacturer's refusal to deal, may create a situation which is neither purely vertical nor purely horizontal. Tunis I suggested that the Supreme Court in Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) recognized a critical difference "between accepted supplier actions such as pursuing market strategies, whereby a supplier seeks to compete with other manufacturers by imposing 'reasonable' vertical restraints, and those actions of a supplier taken at the direction of its distributor." 763 F.2d at 1497. The Third Circuit went on to explain that "in the latter situation, the restraint becomes primarily horizontal in nature in that one distributor is seeking to suppress its competition by utilizing the power of a common supplier." Ibid.
 
 
 36
 However, we do not agree that we are required to adopt a per se test of illegality for the situation alleged in Crane's complaint. The mere fact that a manufacturer's employee has an interest in a corporation which, subsequent to elimination of an entire set of distributors, is awarded an exclusive distributorship by the manufacturer, does not necessarily mean that the actions of the manufacturer "were taken at the directions of its distributor," nor does it necessarily mean that the "distributor is seeking to suppress its competition by utilizing the power of a common supplier." Indeed, nothing in Crane's complaint suggests that the decision made by BCP and Moss to terminate Crane's distributorship rights, or any other distributor's rights, and subsequently to award an exclusive distributorship to the newly formed GPS corporation, was anything other than a legitimate business decision made for BCP's economic benefit. The fact that Crane's distributorship rights were permanently terminated by that decision, and that consequentially economic injury occurred to Crane, does not necessarily make a violation of Section 1 of the Sherman Anti-Trust Act, even if Moss participated in that decision.
 
 
 37
 Crane's unsupported allegation that "[d]efendants (sic) actions had no economic justification and were based on a course of self-dealing to eliminate plaintiff as a competitor" (Complaint, 8, para. 30) is insufficient to allege any illicit objective under Section 1 of the Sherman Anti-Trust Act in any alleged activity among BCP, Moss, Sanford and GPS. While "[i]nherent conflicts of interest and self-dealing [may] permeate the actions undertaken by defendant, Moss," they do not amount to illicit objectives under the Sherman Anti-Trust Act, and are remediable by shareholder derivative suits, or other means. In our view, this does not necessarily mean that Moss's actions had anticompetitive effect or purpose, and should therefore be measured under a per se test. Therefore, despite Moss's duality of interest in BCP and GPS, Crane's case should be governed by the rule of reason case principles articulated in previous cases, which require a further allegation of anticompetitive purpose or effect at the interbrand level to state a violation of Section 1 of the Sherman Anti-Trust Act.
 
 
 38
 Indeed, if illegality of this distributorship arrangement could be made out by alleging that it was not in the manufacturer's best interest, it would seem that every such arrangement could be challenged on the same ground. Courts have no expertise to make such judgments, and certainly antitrust liability cannot be premised on improvident business decisions.
 
 
 39
 In our view, Crane's complaint does nothing more than suggest the possibility of incidental economic benefit to Moss and Sanford stemming from their ownership interest in GPS. For example, Crane argued on appeal that "all competition concerning the retail sale of these products was eliminated in Ohio and West Virginia by the chief operating officer of the manufacturer for his own personal gain." Crane, however, overlooks the possibility that the decision to award GPS exclusive distributorship rights may increase BCP's ability to compete with other brands of construction machinery parts, and thus, far from violating the Sherman Anti-Trust Act, would indeed further one of its major purposes, the promotion of interbrand competition to the ultimate benefit of consumers. Business Electronics Corp. v. Sharp Electronics Corp., --- U.S. ----, 108 S.Ct. 1515, 1520, 99 L.Ed.2d 808 (1988). "[E]ven though refusals to deal limit intrabrand competition, they are likely to benefit consumers by increasing interbrand rivalry." Hobart International, 796 F.2d at 1227.
 
 
 40
 What seems obvious from Crane's complaint, and argument on appeal, is that elimination of intrabrand competition by a manufacturer is its sole concern. In our view, the complaint merely alleges that plaintiff as distributor, and for the sake of argument, any other similarly situated distributors, were injured when terminated by BCP from distributing BCP construction machinery parts. Because the complaint neither necessarily alleges anticompetitive effect at the interbrand level, in addition to, or in connection with the elimination of all distributors at the intrabrand level, nor any anticompetitive purpose with respect thereto, it is, in our opinion, indistinguishable from the classic "jilted distributor" case set out in Dunn & Mavis, Ace Beer, and Fray Chevrolet, despite Crane's vigorous argument to the contrary.
 
 
 41
 The complaint states that "plaintiff has been injured in its business and has already suffered and will suffer substantial damages including the destruction of a majority of its business." The complaint states that "the conspiracy ... [was] entered into with the purpose and effect of eliminating plaintiff as a competitor and to destroy the business of plaintiff." Absent an allegation of anticompetitive purpose or effect at the interbrand level, we hold that this states nothing more than "commercial disappointment" of the eliminated distributors under Dunn & Mavis. Without an allegation of anticompetitive purpose or effect on the interbrand level, Crane's situation is analogous to Fray Chevrolet where one car dealership was substituted for another, or Ace Beer where one beer distributor was substituted for another. Every distribution choice by a manufacturer could be either a good or bad decision from a business standpoint, but the antitrust laws have never been intended to police such a choice, absent any allegation that such choice is part of a scheme to create monopoly market power by the manufacturer,[3] or which is based on, or causes, anticompetitive effect at the interbrand level.
 
 
 42
 While Crane relies on paragraph 26 of its complaint, which states that the defendants "engaged in an unlawful combination and conspiracy to restrain and monopolize interstate trade and commerce in violation of 15 U.S.C. Section 1," to support its contention on appeal that it had sufficiently stated the restraint of trade element, we regard that as an unsupported conclusory allegation. "[L]egal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." 2A Moore's Federal Practice p 12.07[2.-5] (2d ed. 1987).
 
 
 43
 Therefore, the judgment of the district court is AFFIRMED.
 
 
 44
 WELLFORD, Circuit Judge, concurring.
 
 
 45
 I concur in the result reached and with much of what is said by Judge Boggs. At oral argument, appellant conceded its case was weakest against Bucyrus-Erie ("B-E"), which appeared to be sued because its former employee, appellee Moss, was the alleged principal actor in the conspiracy or scheme to do away with appellant as a distributor. The allegations against B-E otherwise are very vague and general with respect to its part in the alleged conspiracy. The complaint itself concedes that B-E's association with appellant and with the products which it distributed ended almost a year before appellant was advised that its distributorship was terminated. There is simply an insufficient allegation that B-E engaged in the alleged antitrust conspiracy and there was no error in granting B-E a judgment on the pleadings. Havoco of America Ltd. v. Shell Oil Co., 626 F.2d 549 (7th Cir.1980).
 
 
 46
 With respect to GPS Equipment ("GPS"), it is conceded that this defendant corporation did not come into existence until after the termination of Crane. GPS was simply a successor distributor in due course in the territory previously served by appellant, and it was alleged to be an exclusive distributor. In appellant's brief at pages 16 and 17, it is stated with regard to GPS:
 
 
 47
 [N]owhere in the complaint is it alleged that GPS was formed by defendant BCP. The only allegations in the complaint are that defendant Moss, an employee of BCP and Charles Sanford, not an employee of BCP, are the two shareholders of defendant GPS Equipment.... the thrust of plaintiff's complaint is that GPS was not a division or wholly owned subsidiary of BCP, but rather a separate entity set up by defendant Moss and Sanford as part and parcel of the conspiracy to restrain trade.
 
 
 48
 As a separate and unformed entity at the time of appellant's termination, with no ownership connection with BCP, Northwest, or B-E, there is an insufficient allegation to state a cause of action for antitrust violation against GPS. The case was therefore properly dismissed as to GPS which had no being or existence so that it could then conspire with anyone.
 
 
 49
 This is a case of an alleged reshuffling of a vertical type by substitution of one form of distribution of one particular brand for another form of distribution. The complaint does not allege, even conclusorily, any decrease in intrabrand competition. This issue is raised for the first time in Crane's appellate brief. We need not consider or decide this contention, then, and I see no need to discuss it. Furthermore, appellant did not adequately allege any anticompetitive effect of the substitution of another distribution at the interbrand level. Its allegations state an effect only upon itself as a competitor. Therefore, with respect to the remainder of the defendants, the only element of this controversy that could separate it from the typical "jilted distributorship" kind of case is the injection of Moss into the picture. Unless somehow the existence of Moss converts the alleged restraint of trade into a horizontal type thus rendering it perhaps anticompetitive per se, there is nothing but cursory conclusions of anticompetitive conduct here asserted, and the case must fail. See Ace Beer Distributors v. Kohn, Inc., 318 F.2d 283, 287 (6th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963), and Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729 (9th Cir.1987).
 
 
 50
 Judge Boggs' analysis of this case under the rule of reason approach seems to me correct and appropriate. See Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Moss held positions with both B-E and GPS, and at the pertinent time before termination of appellant, had not yet formed GSP. There is no sufficient factual allegation made by appellant that he or any of the defendants acted for reasons apart from economic justification or for illicit horizontal objectives. There was no allegation about illegal price constraints. Appellant's reliance upon Tunis v. Ford Motor Co., 823 F.2d 49 (3d Cir.1987), cert. denied, --- U.S. ----, 108 S. Ct. 1013, 98 L.Ed.2d 979 (1988), based upon Moss' alleged "independent personal stake" seems insufficient particularly in light of Business Electronics Corp. v. Sharp Electronics Corp., --- U.S. ----, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988), and the general rule that a corporation and its own officers cannot legally conspire.
 
 
 51
 I, accordingly, join in the affirmance of the dismissal of this action.
 
 
 
 [1]
 Crane also filed claims under the Organized Crime Control Act of 1970 (otherwise known as the Racketeer Influenced and Corrupt Organizations Act (RICO)), 18 U.S.C. Sec. 1964, and state law theories of unfair competition, breach of fiduciary duty and trust, misrepresentation, breach of good faith, and promissory estoppel. The district court ruled against Crane on the RICO claim, and Crane failed to appeal that ruling to this court. We express no view as to the validity of any of these claims
 
 
 [2]
 This case was vacated by the Supreme Court in light of Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). See Ford Motor Company v. Tunis Brothers Co., Inc., 475 U.S. 1105, 106 S.Ct. 1509, 89 L.Ed.2d 909 (1986). Tunis I was therefore not available to the district court in the instant case as guidance or authority in ruling on the 12(b)(6) motion to dismiss. In Tunis Brothers Company, Inc. v. Ford Motor Company, 823 F.2d 49 (3rd Cir.1987) (Tunis II ), the court held that Matsushita did not require a different result and reaffirmed its original 1985 decision. However, we remain unconvinced that either Tunis I or Tunis II requires a per se test to be applied to the facts as alleged in Crane's complaint
 
 
 [3]
 See Posner, The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality, 48 U.Chi.L.Rev. 6, 16 (1981)