**NORTHEASTERN EDUCATIONAL TELEVISION OF OHIO, INC., Plaintiff,**

v.

**EDUCATIONAL TELEVISION ASSOC. OF METROPOLITAN CLEVELAND, et al., Defendants.**

**No. C87–1666.**

United States District Court, N.D. Ohio, E.D.

Dec. 28, 1990.

David A. Lieberth, David A. Lieberth & Assoc., Akron, Ohio, for Northeastern Educational Television.

Stephen J. Squeri, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for Educational Television Assoc. and Betty Cope.

Robert A. Burka, Knopf & Burka, Washington, D.C., for Eastern Educational Network, Inc.

Anthony J. Damelio, Jr., Arter & Hadden, Cleveland, Ohio, for Interregional Program Service.

Jan Schneider, Washington, D.C., and Clair E. Dickinson, Brouse & McDowell, Akron, Ohio, for CBC Enterprises.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, Senior District Judge.

### I.

This action alleges violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. Sections 1 and 2), and was originally brought pursuant to Sections 1, 4, 5, 12 and 16 of the Clayton Act (15 U.S.C. Sections 12, 15, 16, 22 and 26). As noted in this court's November 26, 1990 Order, 758 F.Supp. 1560, this action is currently "proceeding only with its prayer for injunctive relief under 15 U.S.C. § 26." *Id.* at 1561.

The plaintiff is Northeastern Educational Television of Ohio, Inc. (hereinafter "NETO") which operates as WNEO–TV (Channel 45) out of Alliance, Ohio and WEAO–TV (Channel 49) out of Akron, Ohio. In an Order filed by this court on November 26, 1990, summary judgment was granted in favor of defendant CBC Enterprises, and CBC has accordingly been dismissed from this suit. There are four defendants remaining. First, Educational Television Association of Metropolitan Cleveland (hereinafter "ETAMC") operating as WVIZ–TV (Channel 25) out of Cleveland, Ohio. Betty Cope, President and General Manager of WVIZ–TV, is a separate defendant. A third, defendant is Eastern Educational Network, Inc. (hereinafter "EEN"), a Massachusetts corporation which prepares, produces, disseminates and cooperates with others in the broadcasting of educational television. The fourth defendant is the Interregional Program Service (hereinafter "IPS"), which "is a management committee formed by one representative from each regional network with member stations electing the remaining ten members." Complaint Under Sherman Antitrust Act at paragraph 8. The IPS is an unincorporated service of EEN, described below as either "EEN" or "IPS" or "EEN/IPS", depending on the context.

This court's November 26, 1990 Order noted the following allegations in plaintiff NETO's complaint:

10. All of the Defendants have violated the provisions of [the Sherman Act] ... in that they are engaged in a combination and conspiracy to place unlawful restraints upon trade and commerce in Ohio.

11. Defendants have combined to destroy competition and to secure a monopoly by the institution of a policy known as Duplicate Market Criteria. This policy classifies WVIZ–TV as the "primary licensee" and WNEO–TV/WEAO–TV as the "secondary licensee", which allows the primary licensee the right to exclusive programming if it so chooses. Exclusivity of programming began on or about January 1, 1985 and continues as a

policy promulgated by the Defendants Interregional Program Service and Eastern Educational Network, Inc.

. . . .

13. Such exclusive practices engaged in by the Defendants injure competition and public television viewers throughout the coverage area of WNEO–TV and WEAO–TV. Since January 1, 1985, the Defendants have elected to deny WNEO–TV and WEAO–TV the right to purchase at least 130 programs offered by Interregional Program Service that otherwise could have been purchased by Plaintiff except for the unlawful actions of the Defendants, including the program, "Nature of Things." These practices denying substantial portions of the population of Northeast Ohio access to said programs constitute an unlawful restriction of competition as Plaintiff can no longer acquire these quality programs, even on a competitive basis with WVIZ–TV.

Complaint Under Sherman Antitrust Act at paragraphs 10, 11, 13. The relevant statutory law is contained in Sections 1 and 2 of the Sherman Act.[1]

By motion filed July 20, 1988, defendants EEN and IPS move for summary judgment. By motion filed that same date, defendants ETAMC and Betty Cope, likewise, move for summary judgment. On May 9, 1990, this case was transferred to the docket of U.S. Senior District Judge William K. Thomas. The court now considers the remaining defendants' motions for summary judgment.

## II.

EEN and IPS state as a basis for their motion for summary judgment that there are "undisputed, procompetitive benefits of EEN's Duplicate Market Criteria policy challenged in this case," and that, "Plaintiff has not and cannot prove that the policy has harmed competition in the relevant market." Motion of EEN and IPS for Summary Judgment, filed July 20, 1988. IPS' policies, and specifically the "Policy For Duplicated Markets," is at the heart of this lawsuit.[2] EEN/IPS describe this poli-

---

1. Section 1 provides in pertinent part:

   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

   15 U.S.C. Section 1. Section 2 of the Sherman Act provides:

   Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony. . . .

   15 U.S.C. Section 2.

2. The IPS Policy For Duplicated Markets provides:

   * 1. A duplicated market exists where a substantial portion of the service area of one station is overlapped by the service area of another station with transmitters in the same state.

   * 2. The EEN President is responsible for making the determination that a duplicated market exists whenever the question arises.

   * 3. The EEN Board of Trustees will determine which station or stations in a duplicated market is a primary member and which station or stations are secondary members taking into consideration factors such as allocation rate, the population receiving duplicated public television services, the size of the communities receiving duplicated public television services and IPS membership seniority.

   4. All primary/secondary membership determinations will be reviewed by the EEN Board of Trustees.

   5. Primary affiliates will have exclusivity for all purchases made through IPS with the following exceptions:

   a. Producer/program supplier may deny exclusivity.

   b. Primary stations can relinquish exclusivity.

   6. Primary affiliates will have a 30–day option period within which to purchase an offered program.

   7. If the primary affiliate does not exercise its purchase option, the secondary affiliate may either purchase at the primary affiliate's rate with exclusivity, or at its designated rate without exclusivity.

   8. If stations within a designated overlap area purchase non-exclusive but total rights for a program, they may do so upon agreement by all parties. Such a purchase will be costed at the allocation rate as assigned to each station (NIGHTLY BUSINESS REPORT). Exhibit A.1. to Memorandum of EEN and IPS in Support of Motion for Summary Judgment.

   The IPS policy on "Primary/Secondary Affiliation Designations" provides further that, "Our operating principles require that the EEN Board of Trustees review primary/secondary designations annually in duplicated markets." *Id.* As

cy with regard to the parties in this case as follows:

> [The] policy permits a designated primary public station (here, defendant ETA[MC], Channel 25 in Cleveland) to have exclusive rights for a limited period to license some of EEN's offerings. NETO is designated a secondary station and, as a result, cannot receive EEN program offerings subject to the challenged Duplicate Market Criteria policy unless the primary licensee ETA[MC] elects not to license the programming in question or else waives its rights to exclusivity. *See* Complaint paragraphs 11–12.

IPS/EEN Memorandum in Support of Motion for Summary Judgment at 2–3 (footnote omitted). EEN/IPS also have an allocation rate policy, which is used to determine the price a station must pay for licensing a program offering. This allocation rate is a fixed percentage assigned to an individual station, and the percentage is multiplied by the cost of a specific program. Defendants EEN/IPS describe this allocation rate policy as follows:

> EEN uses rate or allocation factors to determine individual public stations' licensing costs for each program offering. Primary stations such as defendant ETA[MC] have higher rate factors than do secondary stations such as [plaintiff] NETO and, as a result, primary stations pay more for a specific program than do secondary stations when one is available to both. If a primary station fails to exercise exclusivity within 30 days, a secondary station (like NETO) can license the programming in question with exclusive rights at the primary station's higher rate or without exclusivity at its own lower rates.

EEN/IPS Memorandum in Support of Motion for Summary Judgment at 3 n. 4 (references to exhibits omitted). The Duplicate Market Criteria policy is actually a subpart of the EEN/IPS Allocation Rate Procedures.

EEN/IPS claim that their Duplicate Market Criteria policy is procompetitive. In support of this assertion, defendants EEN/IPS state:

> [T]he policy challenged in this case furthers the primary goal of public broadcasting to increase the diversity of programming available to the viewing public and does so in a way that both (a) maximizes EEN's revenues (and facilitates acquisition of the programming in the first place); and (b) reduces the general licensing costs of making EEN programming available to secondary stations such as plaintiff NETO.

EEN/IPS Memorandum in Support of Motion for Summary Judgment at 5. Defendants EEN/IPS claim that the foregoing statement supports their position in several ways. First, diversity for the viewers is promoted by a policy which prevents two television stations with overlapping viewership from airing the same show. Second, EEN/IPS argue that, "the principal impact of the Duplicate Market Criteria policy is to increase the likelihood that the higher paying station will in fact license subject programming." EEN/IPS Memorandum in Support of Motion for Summary Judgment at 17. These defendants argue that if two stations in the same viewing area have a right to run the same program, it is unlikely that the larger station, which would pay more for the program under the Allocation Rate Procedure, would purchase the program with the attendant risk of "erosion of its viewing audience." *Id.* Third, EEN/IPS argue that prior to instituting the Duplicate Market Criteria policy, "EEN charged all stations the same license fee for programming in duplicated markets and provided equal access to the programming in question." *Id.* at 22. Defendants EEN/IPS argue that under the Duplicate Market Criteria policy plaintiff NETO gets the benefits of a lower license fee for programs purchased from IPS.

revised 1/14/87, the IPS policy included the following primary/secondary affiliation designation:
  * WVIZ, Cleveland
   WNEO/WEAO, Alliance/Akron

*Id.* The asterisk next to WVIZ represents the fact that WVIZ is designated the primary affiliate.

Plaintiff NETO, on the other hand, views the effects of the Duplicate Market Criteria policy quite differently. NETO argues:

> The effect of the Duplicate Market Criteria has been to deny to WNEO viewers in the Youngstown area any opportunity to view more than 179 programs offered by EEN since enactment of the policy; and to deprive Akron–Canton–Kent viewers of WEAO of an alternative viewing choice.

NETO's Memorandum in Opposition to Summary Judgment at 2. NETO calls the court's attention to the "Minutes of the IPS Advisory Committee meeting where the policy was introduced in April, 1983," which contain the notation, " 'Consensus was to find a solution to *minimize competition* among licensees.' (Porter, Exhibit C. p. 3)." NETO's Memorandum in Opposition to Summary Judgment at 11 (emphasis in original). NETO further argues:

> Defendants EEN and IPS enacted the policy that does not allow NETO to bid for programs at *any* price. The Defendant Betty Cope is the only officer of Defendant WVIZ who either makes program selections or controls selections; and since January 1, 1985, wherever possible excepting only those free "exchange" programs available to all IPS members, has denoted each program selected for WVIZ as "exclusive". (Cope, 112–115)
>
> For reasons described *infra* use of non-bid provisions are inherently anti-competitive.

*Id.* at 19.

Challenging plaintiff's conspiracy argument against the defendants, Betty Cope and ETAMC, in their Memorandum in Support of Motion for Summary Judgment, state that, "Neither WVIZ nor Betty Cope participated in the decision to institute the Duplicate Market Criteria policy when it was approved by EEN and IPS in September of 1984." *Id.* at 7 (exhibit references omitted). WVIZ and Betty Cope also argue that the Duplicate Market Criteria policy is procompetitive, and therefore causes no antitrust injury to competition. In addition, these defendants argue that summary judgment should be granted in their favor because:

> [E]xclusivity arrangements, like the Duplicate Market Policy at issue is this case, are deemed to be lawful unless a plaintiff can show that there are no alternative sources of supply for the products at issue. In the instant case, NETO's own representatives have testified that alternative programming is overwhelmingly available from numerous sources and that NETO itself has been able to purchase such alternative programming.

*Id.* at 2–3.

Having delineated the parties' positions, it is clear that there is a great difference of opinion as to the purpose and effect of EEN/IPS' Duplicate Market Criteria policy. The issue before this court, however, is only whether or not such policy violates the antitrust laws.

### III.

This court's November 26, 1990 Memorandum and Order granting summary judgment to defendant CBC Enterprises discussed the summary judgment standard under Fed.R.Civ.P. 56(c) at length. After references to both *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), and *Bouldis v. U.S. Suzuki Motor Corp.,* 711 F.2d 1319 (6th Cir.1983), this court stated:

> Regardless of the "reluctance" to grant summary judgment in antitrust cases which existed previously, since the United States Supreme Court's decisions in [*Anderson v.*] *Liberty Lobby,* [477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)] *Celotex* [*Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)], and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574 [106 S.Ct. 1348, 89 L.Ed.2d 538] (1986), there is clearly no presumed reluctance to grant summary judgment in antitrust cases, complex or otherwise, under the current law.

November 26, 1990 Memorandum and Order 758 F.Supp. at 1564 (other citations omitted). This court went on to quote both *Monsanto Co. v. Spray–Rite Service*

*Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986):

> While affirming the Seventh Circuit in *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752 [104 S.Ct. 1464, 79 L.Ed.2d 775] (1984), the Court ruled the Court of Appeals had applied an incorrect standard in a vertical price fixing case. The *Monsanto* Court states:

> > The correct standard is that there must be evidence that tends to exclude the possibility of independent action by the manufacturer and distributor. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective. Under this standard, the evidence in this case created a jury issue as to whether Spray–Rite was terminated pursuant to a price-fixing conspiracy between Monsanto and its distributors. The judgment of the court below is affirmed.

> *Id.* [465 U.S.] at 768 [104 S.Ct. at 1473] (footnote omitted). The Court in *Matsushita* elaborates further on what an antitrust plaintiff must show in order to "survive a motion for summary judgment":

> > But antitrust law limits the range of permissible inferences from ambiguous evidence in a Section 1 case. Thus, in *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752 [104 S.Ct. 1464, 79 L.Ed.2d 775] (1984), we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Id.,* at 764 [104 S.Ct. at 1470]. See also [*First National Bank of Arizona v.*] *Cities Service, supra,* [391 U.S. 253], at 280 [88 S.Ct. 1575 at 1588, 20 L.Ed.2d 569 (1968)]. To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of Section 1 must present evidence "that tends to

> > exclude the possibility" that the alleged conspirators acted independently. 465 U.S., at 764 [104 S.Ct., at 1471]. Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents. See *Cities Service, supra,* at 280 [88 S.Ct. at 1588].

> *Matsushita,* 475 U.S. at 588 [106 S.Ct. at 1356–57].

November 26, 1990 Memorandum and Order 758 F.Supp. at 1565. Also important in considering a summary judgment motion is the substantive law and burden of proof applicable in the case. *See Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989).

## IV.

The questions presented in this case are (1) does the Duplicate Market Criteria policy enacted by EEN/IPS, and the designation of WVIZ as the primary affiliate, act to unreasonably restrain trade? and (2) do defendants WVIZ, Betty Cope, EEN and IPS, or any combination of them, exercise monopoly control over the relevant market (product and geographic) which is the subject of this lawsuit?

### A.

Addressing the first of these questions, plaintiff NETO argues that, "The Duplicate Market Criteria enacted by defendants EEN and IPS, and implemented by defendants WVIZ, Betty Cope, and CBC, constitutes *per se* violation of federal antitrust law." NETO's Memorandum in Opposition to Summary Judgment at 26. NETO differentiates the case of *Ralph C. Wilson Industries, Inc. v. Chronicle Broadcasting Co.,* 794 F.2d 1359 (9th Cir. 1986), which was discussed in this court's November 26, 1990 Memorandum and Order.

*Ralph C. Wilson Industries, Inc.* involved the plaintiff Wilson, the licensee of an independent television station licensed to San Jose, California, alleging antitrust violations on the part of several network

and independent television stations and the suppliers of non-network television programs. Wilson contended that the plaintiffs' exclusive program licensing practices unreasonably restrained trade and that the defendant television stations were engaging in a "horizontal conspiracy to deny appellant access to quality television programming." *Id.* at 1362 (footnote omitted). The Ninth Circuit applied the rule of reason standard, stating that plaintiff-appellant Wilson "must show that station appellees' practices injured or decreased competition." *Id.* at 1363. Referring to the often cited language from *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the court in *Wilson* states, "The antitrust laws were enacted for 'the protection of *competition,* not *competitors.*'" *Ralph C. Wilson Industries, Inc.*, 794 F.2d at 1363 (citing *Brown Shoe Co., supra.*) (emphasis in original). Continuing, the Ninth Circuit states, "We have held that 'it is injury to the market, not to individual firms, that is significant.'" *Ralph C. Wilson Industries, Inc.*, 794 F.2d at 1363 (citations omitted). After defining the relevant market, the *Wilson* court ultimately found that the plaintiff had not shown "any genuine issue of material fact with regard to actual injury to competition in the relevant market." *Id.* at 1364. Likewise, the court did not find genuine issues of material fact "concerning a conscious commitment to a common scheme to deny programming to [plaintiff]." *Id.* at 1366. Accordingly, the Ninth Circuit in *Wilson* affirmed the district court's granting of summary judgment.

NETO differentiates the *Wilson* case based on the following statement regarding the facts in that case:

> "The station Appellees negotiated from the supplier Appellees exclusive rights to license programs, following a *competitive bidding* process among interested stations." (emphasis supplied)

NETO's Memorandum in Opposition to Summary Judgment at 26. NETO argues that in the case before this court competitive bidding is precluded by the EEN/IPS policy, thereby distinguishing the IPS policy from the policy in *Wilson,* and making the IPS policy a *per se* violation of the antitrust laws. EEN/IPS argue in reply that NETO "misses the point." Reply Memorandum of EEN and IPS in Support of Motion for Summary Judgment at 4. Defendants EEN and IPS argue further:

> Not only are there numerous public television programming sources other than EEN, but there are other public television distributors that compete with EEN to acquire product, including the Public Broadcasting System ("PBS"), which is significantly larger than EEN. ... The competition plaintiff assertedly seeks is already present.

*Id.* The fact that a competitive bidding procedure was present in that case is mentioned only in the facts, and is not the subject of that court's discussion. In terms of *per se* illegality, it is clear that the Ninth Circuit did not find television programming exclusivity to be *per se* illegal.

NETO likens the IPS policy to the ethical rules prohibiting competitive bidding for engineering services which were subject to an antitrust challenge in *National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). In *National Soc'y of Professional Eng'rs v. United States*, the Supreme Court affirmed the court of appeals' finding that the ethical rules prohibiting competitive bidding for engineering services violated the antitrust laws.

This court finds *National Soc'y of Professional Eng'rs* to be clearly distinguishable from the facts in this case. In the *Professional Eng'rs* case, one hundred percent of the market for professional engineering services was constrained by the Society's ethical rules. NETO, on the other hand, admits to purchasing programming from 20–30 distributors in 1987.[3] NETO's position vis-a-vis IPS is nothing

**3.** *See* Portions of Record Cited in Accompanying Memorandum of EEN and IPS in Support of Motion for Summary Judgment, Tab C, Excerpts from the transcript of deposition testimony by Jerry Schumacher, Director of Programming for plaintiff Northeastern Educational Television of Ohio, Inc., taken October 27, 1987 at 25.

like the relationship between a professional engineer and the society which governs his professional services.

The EEN/IPS designation of WVIZ as a "primary affiliate" does bare some similarity to an exclusive distributorship arrangement. In fact, an exclusive distributorship arrangement is considerably more restrictive than the Duplicate Market Criteria policy, which in effect simply gives a right of first refusal to the designated "primary affiliate."

The United States Court of Appeals for the Sixth Circuit stated in *Elder–Beerman Stores Corp. v. Federated Dep't Stores*, 459 F.2d 138 (6th Cir.1972):

> Thus, it is well settled that it is not a *per se* violation of the antitrust laws for a manufacturer or supplier to agree with a distributor to give him an exclusive franchise, even if this means cutting off another distributor.

*Id.* at 144 (citations omitted). More recently, in *Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.*, 854 F.2d 802 (6th Cir.1988), the Sixth Circuit discusses the effect of the antitrust laws on an exclusive distributorship arrangement. In *Crane & Shovel*, Crane & Shovel Sales Corp. (Crane) had been the exclusive distributor for construction machinery parts manufactured by Bucyrus–Erie Co. (B–E). Another manufacturer of construction equipment, Bucyrus Construction Products (BCP), bought out B–E's construction machinery parts division. Sometime after this buy-out, defendant Moss, who had been employed by B–E, became BCP's Chief Operating Officer. About one year after the buy-out, GPS Equipment Corporation (GPS) was formed. "Moss was both a substantial shareholder and an officer of GPS." *Id.* at 804. Shortly thereafter, BCP terminated its exclusive distributorship arrangement with Crane and made GPS the exclusive distributor of BCP construction machinery parts in two states.

The court in *Crane & Shovel* states:

> Sixth Circuit precedent, supported by antitrust law in other Circuits, makes clear that a complaint charging restraint of trade based on a manufacturer's substitution of one distributor for another must allege anticompetitive effect at the interbrand level to survive a Rule 12(b)(6) motion for failure to state a violation of Section 1 of the Sherman Anti–Trust Act.

*Id.* at 807. The Sixth Circuit quotes the following statement from *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), explaining the distinction between *inter*brand competition and *intra*brand competition:

> Interbrand competition is the competition among the manufacturers of the same generic product—television sets in this case—and is the primary concern of antitrust law. The extreme example of a deficiency of interbrand competition is monopoly, where there is only one manufacturer. In contrast, intrabrand competition is the competition between the distributors—wholesale or retail—of the product of a particular manufacturer.

*Crane & Shovel Sales Corp.*, 854 F.2d at 806 (quoting *GTE Sylvania*, 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19). The Sixth Circuit goes on to discuss other exclusive distributorship cases, including *Ace Beer Distributors, Inc. v. Kohn, Inc.*, 318 F.2d 283 (6th Cir.1963), *cert. denied*, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963), and *Fray Chevrolet Sales, Inc. v. General Motors Corp.*, 536 F.2d 683 (6th Cir.1976), among others. After discussing these cases, the *Crane & Shovel* court says, "The *Fray* court's reliance on *Ace Beer* suggests that the substitution of one distributor for another has no necessary effect on competition at the interbrand level." *Crane & Shovel*, 854 F.2d at 806.

The allegations in exclusive distributorship cases, as well as the allegations in this case, suggest vertical restraints on trade. In this case it is alleged that the supplier of programming, EEN/IPS, are favoring one distributor, WVIZ, over another distributor, NETO, through the use of the Duplicate Market Criteria policy. The exclusivity aspect of this policy is clearly a vertical, non-price restraint, and is therefore exam-

ined under the rule of reason standard.[4] *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). The Court in *GTE Sylvania* explains this rule as follows:

> Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.

*Id.* at 49, 97 S.Ct. at 2557 (footnote omitted).

In *Crane & Shovel* the Sixth Circuit refuses to apply a *per se* test to the vertical restraint alleged in that case. The court states, "Were a *per se* test of illegality necessarily applied to elimination of all intrabrand competition by a manufacturer, we fear that procompetitive vertical restraints may be seriously deterred." *Id.* at 808. The court goes on to quote a statement from *Davis–Watkins Co. v. Service Merchandise*, 686 F.2d 1190 (6th Cir.1982), *cert. denied*, 466 U.S. 931, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984), that while vertical restraints may eliminate some intrabrand competition, they tend "to be potentially beneficial to interbrand competition." *Crane & Shovel*, 854 F.2d at 808 (quoting *Davis–Watkins Co.*, 686 F.2d at 1196). This court notes that the defendants make the same argument in this case.

In *United Video, Inc. v. F.C.C.*, 890 F.2d 1173 (D.C.Cir.1989), the United States Court of Appeals for the District of Columbia Circuit reviewed challenges to the F.C. C.'s "syndicated exclusivity" rules. That court describes these rules as "allow[ing] the supplier of a syndicated program to agree with a broadcast television station that the station shall be the exclusive presenter of the program in its local broadcast area." *Id.* at 1176. The D.C.Circuit stated the following about the desire for exclusivity:

> The record as a whole shows that both broadcast and cable companies want complete exclusivity; the Commission did not act without reason in concluding that exclusivity must be a valuable commodity, and conversely that lack of exclusivity diminishes the value of a program.

*Id.* at 1180. The *United Video* court goes on to say:

> We think the Commission's conclusion about the link between lack of program diversity and lowered broadcast revenues due to lack of exclusivity is sufficiently in accord with accepted economic theory that it can stand without empirical support, particularly since we agree with the Commission that it would be very difficult for it to show the degree to which programs are currently *not* being produced because of the lack of syndex protection [i.e., exclusivity].

*Id.* While *United Video* is not an antitrust case, both the F.C.C. and the D.C. Circuit's assessment of the value and effect of exclusivity is particularly relevant to this court's rule of reason analysis of the exclusivity policy at issue in this case. Indeed, it is quite reasonable to assume on the

---

**4.** This court's November 26, 1990 Memorandum and Order "noted that exclusivity in the television industry is not strictly prohibited." *Id.* at 12. In so stating, this court quoted from 47 C.F.R. Section 73.658(m). The most recent edition of the Code of Federal Regulations includes Parts 70 to 79, "Revised as of October 1, 1989." This edition contains no notes to Section 73.-658(m). However, 54 Fed.Reg. 46,900 contains the following amendment to 47 C.F.R. Section 73.658(m):

> SUMMARY: This Order reinstates Notes 1, 2, 3, and 4 to Paragraph (m) of § 73.658 of the Commission's Rules. The notes were inadvertently removed from the text following adoption of the Report and Order in Gen. Docket No. 87–24 (53 FR 27167, July 19, 1988; FR Doc. 88–16187) and are needed to clarify the procedures set out in that Rule Section.

54 Fed.Reg. 46,900 (to be codified at 47 C.F.R. Section 73.658(m)). As amended, Note 3 provides:

> The provisions of this paragraph apply only to U.S. commercial television broadcast stations in the 50 states, and not to stations in Puerto Rico or the Virgin Islands, foreign stations or noncommercial educational television or "public" television stations (either by way of restrictions on their exclusivity or on exclusivity against them).

54 Fed.Reg. 46,901 (to be codified at 47 C.F.R. Section 73.658(m)). With this amendment, Section 73.658(m) appears to limit exclusivity as to commercial television stations, but does not limit exclusivity by or against "educational television or 'public' television stations."

facts of this case that the IPS exclusivity policy has increased interbrand competition, by causing secondary affiliates like NETO to go to suppliers other than IPS/EEN to purchase certain programming. From the television viewers' perspective, it is equally clear that the IPS policy increases the diversity of programming available to the viewing public.

This court concludes that under the rule of reason analysis the Duplicate Market Criteria policy does not constitute an "unreasonable restraint of trade" in violation of Section 1 of the Sherman Act. What is more, there is absolutely no evidence, either direct or circumstantial, "that reasonably tends to prove" that any of the defendants in this case "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto,* 465 U.S. at 768, 104 S.Ct. at 1473. The foregoing reasoning applies to defendants Betty Cope and ETAMC, as well as EEN and IPS. In *Elder–Beerman Stores Corp., supra,* the Sixth Circuit states:

> We interpret the "rule of reason" as meaning that the granting of exclusive selling rights or acceptance of such exclusive selling rights, acts which are not prohibited by law unless there is a resulting foreclosure of market alternatives cannot, without proof of such foreclosure, form the basis for a jury verdict that the defendants had entered into a conspiracy to restrain trade.

*Id.* at 146 (footnote omitted). The remaining question is whether or not the defendants, or any combination of them, exercise monopoly control over the relevant product and geographic markets in violation of Section 2 of the Sherman Act.

### B.

The first step in determining whether or not monopoly power is being exercised by the defendants in this case is to determine what the relevant product market is. Plaintiff NETO alleges in its complaint that, "Defendants have the market power to significantly affect competition under the exclusivity rules promulgated by and implemented by them and have the power to affect available pro-

gramming, prices of programming, and other market components." Complaint Under Sherman Antitrust Act at paragraph 15. Defining the product market at issue in this case, NETO states:

> The narrow product market in which the anticompetitive provisions of the Duplicate Market Criteria are played consist of programs acquired specially for public television, that is, programs acquired by IPS.

NETO's Memorandum in Opposition to Summary Judgment at 24. It is true, of course, that IPS dominates the market of "programs acquired by IPS." It would be an anomalous result, however, if product markets were defined so narrowly that one always has illegal monopoly power over its "own market." In *Lynch Business Machines, Inc. v. A.B. Dick Co.,* 594 F.Supp. 59 (N.D.Ohio, E.D.1984), the court holds:

> Monopoly power cannot be shown through a manufacturer's control of its own product, because a manufacturer cannot monopolize its own product. *Dunn & Mavis, Inc. v. Nu–Car Driveaway, Inc.,* 691 F.2d 241, 244 (6th Cir. 1982). Instead, plaintiff must show that defendant controlled a predominant share of the product market in the relevant geographic area. *United States v. Grinnell Corp.,* 384 U.S. 563, at 571, 86 S.Ct. 1698, at 1704, 16 L.Ed.2d 778 (1966).

*Id.* at 66. *See also Mullis v. ARCO Petroleum Corp.,* 502 F.2d 290, 295–97 (7th Cir. 1974). For antitrust purposes, relevant markets are to be defined in terms of the market in which a product competes. The Court in *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), states:

> Thus one can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product. However, this power that, let us say, automobile or soft-drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly. Illegal power must be appraised in

terms of the competitive market for the product.

*Id.* at 393, 76 S.Ct. at 1006 (footnotes omitted). Construing the relevant product market most favorably to the plaintiff, but within the parameters of the preceding case law, it is defined as the market of suppliers "of programs acquired specially for public television."

■ Turning to the relevant geographic market, defendants ETAMC and Betty Cope state, "Plaintiff NETO has described the market in which it purchases television programming as a 'world market.'[5] NETO Rule 30(b)(6) Dep. at 22–24." Memorandum of ETAMC and Betty Cope in Support of Motion for Summary Judgment at 9. Because the allegations in this case are directed at the defendants' alleged monopoly power, the court must define the relevant market in terms of the market in which the defendants, specifically EEN and IPS, compete. It appears that the market in which NETO "purchases television programming," and the market in which IPS and EEN compete is one and the same. For purposes of this decision, the court fixes the world market as the relevant geographic market, since NETO itself concedes that EEN and IPS compete in a "world market" of available public television programming. It is clear that NETO, as well as EEN/IPS, are free to purchase their programs from any supplier, distributor or production company they choose.

Thus, the relevant market in this case is the world market of suppliers "of programs acquired specially for public television."

5. ETAMC and Betty Cope's reference to a world market comes from the following testimony of NETO president Torey Southwick, taken pursuant to Fed.R.Civ.P. 30(b)(6):

Q. Is it NETO's contention any of the other defendants have market power?
A. Well, EEN through the Interregional Program Service, through its ability to aggregate stations throughout the country to make group purchases, and of very attractive programs, certainly affects the availability of those programs as they might be available through individual syndicators.
Q. What is the market that you perceive EEN operates in?

■ Having defined the relevant market, the court must next determine if defendants EEN/IPS alone, or with the other defendants, have the requisite market power to establish a monopoly. Courts have assessed market power in a variety of ways. Common indicators of market power are an entity's percentage of market share, *Lynch Business Machines, Inc. v. A.B. Dick Co.,* 594 F.Supp. 59, 66–67 (N.D. Ohio, E.D.1984); *Byars v. Bluff City News Co., Inc.,* 609 F.2d 843, 850–51 (6th Cir. 1979), ability to control prices, *Richter Concrete Corp. v. Hilltop Concrete Corp.,* 691 F.2d 818, 827 (6th Cir.1982), and the availability or unavailability of alternative suppliers of an equivalent product. *Cf. Elder–Beerman Stores Corp. v. Federated Dep't Stores,* 459 F.2d 138, 148–49 (6th Cir.1972) (availability of alternative brands discussed in terms of antitrust damages); *Beach v. Viking Sewing Machine Co., Inc.,* 784 F.2d 746, 752 (6th Cir.1986) (same). Plaintiff NETO fails to provide the court with a specific figure representing the percentage of market share held by EEN/IPS in the market which supplies "programs acquired specially for public television." NETO does state, however, that:

Defendants EEN and IPS have created the largest buying consortia for quality public television programs in the United States, second only to the Public Broadcasting Service.

NETO's Memorandum in Opposition to Summary Judgment at 24. It is unclear how the characterization "quality public television programs" affects this statement, in light of this court's determination

A. I would—I guess I would have to suggest it's world market. When you have the ability to aggregate most public television stations in the country together in group buys for specific programs, that would certainly give you some power in acquiring the rights to those programs for those stations no matter where in the world they might be purchased. Appendix to the Memorandum of Defendants Educational Television Association of Metropolitan Cleveland and Betty Cope in Support of Motion for Summary Judgment, Exhibit 5, Deposition of Torey Southwick at 22.

of the relevant product market as being all suppliers of public programming. In any event, in his deposition on October 28, 1987, NETO President Torey Southwick acknowledged that PBS does not have an exclusivity policy.[6] Thus, without reference to other available alternate programming, NETO may purchase public television programming from PBS. As far as ability to control prices, there is no indication that EEN/IPS have any such ability in the relevant market. Furthermore, the prices paid by IPS licensees is based on a fixed formula.[7] EEN/IPS state the following about the rate stations pay for programming:

> The amount that participating stations pay for individual EEN distributed programming depends on the rate or allocation factor EEN assigns to each station. A station's rate is a function of two factors: the size of its potential viewing audience, and the amount of funds raised by the station. In general, the higher the factor, the more that is paid by the participating station for a specific program. Defendant ETA's assigned factor for Channel 25 in Cleveland has been higher than NETO's factor for *both* of

its stations since the institution of the Duplicate Market Criteria (in slightly different form) in January 1985.

Memorandum of EEN and IPS in Support of Summary Judgment at 15. Indeed, Gene Nichols, Director of Support Services for EEN, testified that the implementation of the primary and secondary designations as part of the IPS policy actually dropped the rates of the secondary stations.[8]

Defendants insist that IPS/EEN's lack of monopoly power is evident by the fact that there are so many other suppliers from whom plaintiff NETO can, and does, purchase educational programming. Referring to the market in which NETO obtains its programming, defendants ETAMC and Betty Cope argue:

> In that world market, NETO has a large number of alternative sources from which to purchase quality television programming suitable to its general and fund-raising needs. NETO Rule 30(b)(6) Dep. at 13, 19, 36.

Memorandum of ETAMC and Betty Cope in Support of Motion for Summary Judgment at 9.[9] NETO's Director of Program-

---

**6.** *See* Appendix to the Memorandum of Defendants Educational Television Association of Metropolitan Cleveland and Betty Cope in Support of Motion for Summary Judgment, Exhibit 4, October 28, 1987 Deposition of Torey Southwick at 159.

**7.** The IPS "Revised Allocation Rate Policy" provides:
   I. *Allocation Formula Criteria*
   IPS licensee allocations are based on CSG/ADI factors weighted equally.
   II. *Modifying Factors*
   1. All UHF stations' ADI (Area of Dominant Influence) are reduced 20%.
   2. ADI of state networks with 50% or more UHF transmitters are reduced 20%.
   3. In a state with both a network and independent licensees, the state network's ADI is reduced proportionately if the network does *not duplicate the independent licensees'* coverage area.
   Portions of Record Cited in Accompanying Memorandum of EEN and IPS in Support of Motion for Summary Judgment, Exhibit A.1. In addition, the Duplicate Market Criteria policy, *supra* note 1, contains additional criteria for determining program prices in duplicated markets.

**8.** Appendix to the Memorandum of Plaintiff Northeastern Educational Television of Ohio,

Inc. in Opposition to Motions for Summary Judgment, Exhibit G, December 11, 1987 Deposition Excerpts of Gene S. Nichols at 90.

**9.** ETAMC and Betty Cope go on to state:
   In addition to EEN, NETO has purchased television programming from, or has been solicited to purchase television programming by, the following profit or non-profit television programming distributors:
   Almi Television;
   American Humane Society;
   BBC;
   Blair Television;
   Buena Vista;
   Central Educational Network;
   Choral Pictures;
   Coe Films;
   Columbia Pictures;
   Devillier–Donegan;
   Disney;
   Encore;
   Four Star;
   Fox Lorber;
   Gary Ganaway;
   Genesis Entertainment;
   Goldwyn;
   Granada Television;
   Harmony Gold;
   IPC Entertainment;

ming admits that NETO purchased programming from 20–30 distributors in 1987. Memorandum of ETAMC and Betty Cope in Support of Motion for Summary Judgment, Exhibit 3, Deposition of Jerry Schumacher at 25.

EEN and IPS call the court's attention to the following testimony of Jerry Schumacher, NETO's Director of Programming:

Q. Now, my question, sir is: Do you have any knowledge or belief or opinion as to whether any of the many stations that do not belong to IPS have any difficulties in acquiring programming adequate for their needs?

A. No, if they wanted to exert the effort, I'm sure they, you know, they can seek out the distributor who is supplying a program that they desire. There are many books available with all types of programs listed, broken down into category, who the distributors are, where they are located, what the names of their representatives are, so, no, if they really had a desire for a particular program or a type of program, they should be able to find it.

IPS and EEN's Memorandum in Support of Motion for Summary Judgment, Exhibit C, Deposition of Jerry Schumacher at 141. NETO's President, Torey Southwick, had this to say about the availability of alternative sources of programming:

Q. Is NETO able to look anywhere beyond IPS or PBS for the purpose of identifying fund raising programs?

A. Certainly.

....

Q. Outside of IPS and PBS, is there good quality programming available to NETO which it can purchase to use during its fund raising periods?

A. Yes. But again, IPS is a service that specifically goes after the icing on the cake. The very special offerings that are very attractive to public television stations specifically.

I can tell you that the Wonderful World of Disney was also a good choice for fund raising.

Memorandum of ETAMC and Betty Cope in Support of Motion for Summary Judgment, Exhibit 5, Deposition of Torey Southwick, June 2, 1988 at 36–37. The foregoing testimony from the plaintiff's own officers, both Jerry Schumacher and Torey Southwick, acknowledges the existence of an abundance of alternative sources of public television programming.

In its Memorandum in Opposition to Summary Judgment, NETO assesses the impact of ETAMC's ability to choose exclusivity on some its programming offered by EEN/IPS:

The effect on Plaintiff NETO has been to deny it from acquiring 179 individual television programs constituting 168 hours of programming since January 1, 1985 through July, 1988. (Southwick affidavit, paragraph 9)

NETO's Memorandum in Opposition to Summary Judgment at 19. In terms of numbers alone, it can hardly be argued

Kent State Teleproductions;
Kentucky Network;
Lionheart TV International;
Long Island Public Television;
MCA;
MGM/UA;
MTM Enterprises;
Maryland Center for Public Broadcasting;
NTA Telefilm;
Ohio Network;
Oklahoma State Network;
Oregon Network;
Pacific Mountain Network;
Paramount;
Public Broadcasting Service;
Silverbach—Lazarus Group;
South Carolina TV;
Southern Education Communications Association;

Syndicaservices;
Taffner;
Tribune Entertainment;
Turner Broadcasting Network;
Twentieth Century Fox;
Viacom Distributors;
WPBT;
WTBS;
Warner Brothers; and
World Vision

Schumacher Dep. at 146–77. Memorandum of ETAMC and Betty Cope in Support of Motion for Summary Judgment at 9–10. The defendants' source for this list of "distributors" is the deposition testimony of Jerry Schumacher, Director of Programming for plaintiff NETO.

that 168 hours of programming over a three and one half year period is a very large part of plaintiff's programming. NETO, however, argues that the EEN/IPS policy, and ETAMC and Betty Cope's use of such policy, has "foreclosed [the plaintiff] from selecting the best public television has to offer." *Id.* at 23. In reviewing an antitrust claim, this court must look to the relevant market as defined. This court has defined this market as the "world market of suppliers 'of programs acquired specially for public television.'" *See supra* p. 1578. A reasonable jury could come to but one conclusion as to the defendants power in this market, and that conclusion is that the defendants clearly do not have monopoly power in the relevant market. Other than the fact the plaintiff NETO desires specific programs from EEN/IPS, NETO has not put forth any evidence to support a finding that defendants EEN and IPS' programming is not irreplaceable by alternate programming within the relevant market in question.

### C.

■ Defendants have also pointed out in their various briefs that:

> EEN has offered to supply programming governed by the Duplicate Market Criteria policy to NETO's other station, WNEO–TV (Channel 45, Alliance). NETO has rejected that offer even though it is technically feasible for NETO to simultaneously broadcast different programming on its two stations. (Southwick DX 14, Tab D1; Dep. Tr. 149–51, 172–73, Tab D).

Memorandum of EEN/IPS in Support of Motion for Summary Judgment at 8; *see also* ETAMC and Betty Cope's Reply Memorandum in Support of Motion for Summary Judgment at 10–11. Plaintiff NETO, in turn, argues that defendants' idea of splitting NETO's signal is an attempt to "eliminate competition from the Akron transmit-

ter" and "is nothing more than a horizontal restraint of 'carving up' the public television market...." NETO's Memorandum in Opposition to Summary Judgment at 34. NETO further argues that the cost of splitting its signal is in excess of $350,000.00. *Id.* at 35.

Under the holdings in *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113, 107 S.Ct. 484, 491, 93 L.Ed.2d 427 (1986), and *Axis, S.P.A. v. Micafil, Inc.*, 870 F.2d 1105 (6th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 83, 107 L.Ed.2d 49 (1989), even to get injunctive relief a "plaintiff must allege threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" *Cargill, Inc.*, 479 U.S. at 113, 107 S.Ct. at 491 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). The "unlawful act" alleged by plaintiff NETO is the enactment and implementation of the Duplicate Market Criteria policy. EEN/IPS, however, have offered WNEO–TV the programs plaintiff claims to have been denied [10], and such offer is without regard to any exclusivity claims by defendant ETAMC's station WVIZ–TV. Regardless of the cost, NETO's decision not to split its signal, which would remove its station WNEO–TV from the effect of the Duplicate Market Criteria policy, is a conscious business decision made by plaintiff NETO. The effects of this decision cannot be directly attributed to the "illegal act" alleged by the plaintiff. Thus many of the viewers which plaintiff claims are being denied certain programming, are being denied such programming due to plaintiff's own policy not to split its signal and not from any policy enacted or implemented by the defendants.

### V.

Plaintiff NETO's frustration with having been denied programming which it desires is understandable. Being designated as a

---

**10.** According to an engineering map created for plaintiff NETO, WNEO–TV only overlaps WVIZ–TV's viewing area by 11.3%, while WEAO–TV overlaps WVIZ–TV's viewing area by 78%. *See* Appendix to the Memorandum of Plaintiff Northeastern Educational Television of

Ohio, Inc. in Opposition to Motions for Summary Judgment, Exhibit D, Map and Accompanying Analysis prepared by Kessler and Gehman Associates, Inc., Telecommunications Consulting Engineers.

"secondary affiliate" under the EEN/IPS Duplicate Market Criteria policy brings with it both advantages in terms of program pricing and disadvantages in terms of the "primary affiliate's" ability to exercise exclusivity. . Indeed, the very fact that NETO has been designated the "secondary affiliate" may be frustrating in and of itself. Nevertheless, the frustration that plaintiff NETO feels is not unlike the frustration, and monetary loss, that an exclusive distributor experiences when its exclusive distributorship is taken away and given to someone else, all at the whim of the supplier. Under these circumstances, there is no question that the jilted party is damaged, but in the absence of an antitrust violation causing antitrust injury, the antitrust laws provide no remedy. In *Ace Beer Distributors, Inc. v. Kohn, Inc.*, 318 F.2d 283 (6th Cir.1963), the Sixth Circuit states:

> The fact that a refusal to deal with a particular buyer without more, may have an adverse effect upon the buyer's business does not make the refusal to deal a violation of the Sherman Act. Damage alone does not constitute liability under the Act.

*Id.* at 287; *see also Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.*, 854 F.2d 802, 809 (6th Cir.1988).

Despite the plaintiff's dislike of the policy in question, plaintiff NETO has presented no evidence of any "combination" or "conspiracy in restraint of trade or commerce," and has thereby failed to state a cause of action under Section 1 of the Sherman Act. 15 U.S.C. Section 1. Likewise, as this court's analysis has revealed, the defendants' position in the relevant market, as well as the abundant alternative supply of public programming, supports this court's conclusion that the defendants do

not have monopoly power in the relevant market. In addition, the court finds no evidence to support a conclusion that the Duplicate Market Criteria policy is part of any combination, conspiracy or "attempt to monopolize" the "world market of suppliers 'of programs acquired specially for public television.'" The court finds further that the Duplicate Market Criteria policy does not unlawfully restrict competition, and having so found, holds that ETAMC and Betty Cope's actions in conjunction with and under that policy, likewise, do not unlawfully restrict competition. For the foregoing reasons, the plaintiff has failed to state a cause of action under Section 2 of the Sherman Act. This court's holding that the defendants have not violated the antitrust laws moots the plaintiff's Third Cause of Action for using government funds "to pay costs and dues to the Defendants Eastern Educational Network, Inc. and Interregional Program Service, thereby constituting an illegal use of said funds...." Complaint Under Sherman Antitrust Act at paragraph 27.[11] Therefore, having failed to state a cause of action under Sections 1 and 2 of the Sherman Act, and with the Third Cause of Action mooted, the defendants' motions for summary judgment must be, and are, GRANTED. All of plaintiff NETO's claims in this action are hereby dismissed with prejudice.

IT IS SO ORDERED.

---

11. This court accordingly makes no determination as to whether or not such a private cause of action exists or not.